**Docket No. 14-56402**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

ASSE INTERNATIONAL, INC.,

*Plaintiff-Appellant,*

v.

JOHN F. KERRY, Secretary of State of the United States,
ROBIN LERNER, Deputy Assistant Secretary of State for Private Sector Exchange,
Bureau of Educational and Cultural Affairs,
and UNITED STATES DEPARTMENT OF STATE,

*Defendants-Appellees.*

*Appeal from a Decision of the United States District Court for the Central District of California,
No. 8:14-cv-00534-CJC-JPR · Honorable Cormac J. Carney*

## APPELLANT'S OPENING BRIEF

IRA J. KURZBAN, ESQ.
EDWARD F. RAMOS, ESQ.
KURZBAN KURZBAN WEINGER
TETZELI & PRATT P.A.
2650 S.W. 27th Avenue, Suite 200
Miami, Florida 33133
(305) 444-0060 Telephone
(305) 444-3503 Facsimile

*Attorneys for Appellant,
ASSE International, Inc.*

 

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Appellant ASSE International, Inc. has no parent corporation, and as a not-for-profit public-benefit corporation, it has no stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................2

INTRODUCTION .................................................................................3

STATEMENT OF THE CASE................................................................76

    1.    Regulatory Background................................................6

    2.    The Sanctions Imposed Against ASSE ...............................8

    3.    District Court Proceedings ............................................15

SUMMARY OF ARGUMENT ...............................................................17

ARGUMENT .......................................................................................20

    I.    THE SANCTIONS IMPOSED AGAINST ASSE ARE
        SUBJECT TO JUDICIAL REVIEW ...................................20

        A.    The applicable regulations relied upon to sanction ASSE
            limit the agency's discretion sufficiently through standards
            that require judicial review .......................................20

        B.    The District Court erred in denying review based on
            the alleged "foreign policy" consequences of deciding
            ASSE's claims.......................................................30

            i.    The exception to judicial review for action
                "committed to agency discretion" does not
                encompass a "foreign affairs" exemption.......................31

            ii.    Judicial review of the sanctions imposed against
                ASSE would neither interfere with U.S. foreign
                relations nor require the Court to second-guess the
                Executive's foreign policy judgments ...........................35

    II.    ASSE STATED A CLAIM THAT ITS DUE PROCESS
        RIGHTS WERE VIOLATED ...........................................39

        A.    ASSE has protectible property and liberty interests ................40

          i.     ASSE has a property interest in its undiminished
               allocation of DS-2019 forms ...........................................40

          ii.    ASSE has a property and liberty interest in
               its reputation and business goodwill..............................46

     B.    The agency violated ASSE's due process rights by
         denying it the opportunity to confront adverse evidence,
         relying on *ex parte* proceedings to support its factual
         findings, and withholding the full basis for its sanctions
         until its final decision................................................................48

CONCLUSION .........................................................................................58

CERTIFICATE OF COMPLIANCE......................................................59

STATEMENT OF RELATED CASES .................................................60

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

## CASES

*Abdelhamid v. Ilchert*, 774 F.2d 1447 (9th Cir. 1985) ..........................36, 37, 38, 39

*Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977
    (9th Cir. 1991) ...........................................................................40, 41, 42, 44

*Alcaraz v. INS*, 384 F.3d 1150 (9th Cir. 2004) .......................................................22

*Alto v. Black*, 738 F.3d 1111 (9th Cir. 2013).........................................................21

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir. 2004)..............................................21

*Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721 (9th Cir. 1975)................29

*Arnett v. Kennedy*, 416 U.S. 134 (1974) ................................................................50

*Arrozal v. INS*, 159 F.3d 429 (9th Cir. 1998) ........................................................25

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................39

*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190 (9th Cir.2004) ..................25

*Bell v. Burson*, 402 U.S. 535 (1971) ......................................................................41

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) ................................................22, 28

*Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986)..................21, 31

*Buckingham v. Secretary of USDA*, 603 F.3d 1073 (9th Cir. 2010)......................50

*Califano v. Sanders*, 430 U.S. 99 (1977) ...............................................................21

*Carnation Co. v. Sec'y of Labor*, 641 F.2d 801 (9th Cir. 1981)............................52

*Castaneda v. USDA*, 807 F.2d 1478 (9th Cir. 1987) ..............................................45

*Ching v. Mayorkas*, 725 F.3d 1149 (9th Cir. 2013)................................................52

*Chong v. Dir., USIA*, 821 F.2d 171 (3d Cir. 1987)...........................................37, 38

*Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316 (3d Cir. 1982)...........................44

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ........................21

*City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859
    (9th Cir. 2002) ................................................................................................28

*City of New York v. Permanent Mission of India to the United Nations*,
    618 F.3d 172 (2d Cir. 2010) .........................................................................33

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ...................................50

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938).........................................25

*Corro-Barragan v. Holder*, 718 F.3d 1174 (9th Cir. 2013) ....................................32

*County of Esmeralda, State of Nev. v. U.S. Dep't of Energy*,
925 F.2d 1216 (9th Cir. 1991) ........................................................................29

*Dina v. Attorney Gen. of U.S.*, 793 F.2d 473 (2d Cir. 1986) ..................................38

*Doyle v. City of Medford*, 606 F.3d 667 (9th Cir. 2010) .........................................43

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ..........................22

*Dumas v. Kipp*, 90 F.3d 386 (9th Cir. 1996) ..........................................................45

*Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco*,
792 F.2d 1432 (9th Cir. 1986) ........................................................................44

*Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584 (9th Cir. 1998)......................43

*Fox v. Clinton*, 684 F.3d 67, 69 (D.C. Cir. 2012)....................................................31

*Gerhart v. Lake County, Mont.*, 637 F.3d 1013 (9th Cir. 2011)..............................41

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..................................................................48

*Greene v. McElroy*, 360 U.S. 474 (1959) ....................................................50, 52, 54

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................21

*INS v. Yang*, 519 U.S. 26 (1996)..............................................................................30

*Jacobson v. Hannifin*, 627 F.2d 177 (9th Cir. 1980) ...............................................43

*Kaur* v. Holder, 561 F.3d 957 (9th Cir. 2009)...................................................49, 50

*Keating v. FAA*, 610 F.2d 611 (9th Cir. 1979)........................................................27

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) .....................................39

*Marshall v. Kleppe*, 637 F.2d 1217 (9th Cir. 1980) ...............................................57

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................55

*Miller v. California*, 355 F.3d 1172 (9th Cir. 2004)...............................................47

*Nat'l Collegiate Rec. Svcs. v. Powell*, No. 02-cv-2676
(D.S.C. Nov. 27, 2002) ...................................................................................34

*Nat'l Collegiate Rec. Svcs. v. Powell*,
  No. 02-cv-2676, Dkt. 44 (D.S.C. Mar. 23, 2004).........................................34

*Ness Inv. Corp. v. USDA, Forest Service*, 512 F.2d 706 (9th Cir. 1975)...............22

*Newman v. Apfel*, 223 F.3d 937 (9th Cir. 2000) ......................................................29

*O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980) ...........................45

*Oshodi v. Holder*, 729 F.3d 883 (9th Cir. 2013) (en banc)....................................52

*Paul v. Davis*, 424 U.S. 693 (1976) ..................................................................18, 47

*Pinnacle Armor, Inc. v. United States*, 648 F.3d 708 (9th Cir. 2011) .............*passim*

*Ralpho v. Bell*, 569 F.2d 607 (D.C. Cir. 1977) ........................................................52

*Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*,
  --- F.3d ----, 2014 WL 4694802 (9th Cir. 2014) .........................................40

*Russello v. United States*, 464 U.S. 16 (1983) .........................................................32

*Senate of State of Cal. v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992).......................21

*Shanks v. Dressel*, 540 F.3d 1082 (9th Cir. 2008)............................................43, 44

*Singh v. Clinton*, 618 F.3d 1085 (9th Cir. 2010) ....................................................31

*Singh v. Moyer*, 867 F.2d 1035 (7th Cir. 1989) ......................................................38

*Slyper v. Attorney Gen.*, 827 F.2d 821 (D.C. Cir. 1987) ........................................38

*Soranno's Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989)..................................46

*Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986).......................54, 55

*Spencer Enters., Inc. v. United States*, 345 F.3d 683 (2003)......................22, 28, 29

*Strickland v. Morton*, 519 F.2d 467 (9th Cir. 1975) ................................................39

*Thornton v. City of St. Helens*, 425 F.3d 1158 (9th Cir. 2005)...............................42

*Ulrich v. City & County of San Francisco*, 308 F.3d 968 (9th Cir. 2002) .............47

*Ursack Inc. v. Sierra Interagency Black Bear Group*,
  639 F.3d 949 (9th Cir. 2011) ........................................................................23

*Van Strum v. Lawn*, 940 F.2d 406 (9th Cir. 1991)...................................................57

*Widmark v. Barnhart*, 454 F.3d 1063 (9th Cir. 2006) ...........................................25

*Willner v. Committee on Character*, 373 U.S. 96 (1963) ........................................52

*Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) .................................................33

*Zoggolis v. Wynn Las Vegas, LLC*, --- F.3d ----, 2014 WL 4694788
    (9th Cir. 2014) ..............................................................................................20

## STATUTES

5 U.S.C. § 553(a)(1)...................................................................................................32

5 U.S.C. § 701(a)(2)............................................................................................*passim*

5 U.S.C. § 702 ...........................................................................................................20

5 U.S.C. § 704 ...........................................................................................................21

8 U.S.C. § 1101(a)(15)(T).........................................................................................11

8 U.S.C. § 1101(a)(15)(T)(ii)(II) ..............................................................................11

8 U.S.C. § 1255(l) .....................................................................................................11

22 U.S.C. § 2451 ...................................................................................................6, 35

22 U.S.C. § 2452(a)(1)(B)(ii) .....................................................................................6

Mutual Educational and Cultural Exchange Act of 1961, Pub. L. 87-256,
    § 101, 75 Stat. 527 ................................................................................................6

## REGULATIONS

8 C.F.R. § 214.11(d) ..................................................................................................11

8 C.F.R. § 214.11(l) ...................................................................................................11

22 C.F.R. § 62.1(a)......................................................................................................35

22 C.F.R. § 62.2 .....................................................................................................6, 36

22 C.F.R. § 62.3(a)(3) ................................................................................................36

22 C.F.R. § 62.5 ...........................................................................................................6

22 C.F.R. § 62.6 ...........................................................................................................6

22 C.F.R. § 62.7(c).....................................................................................................56

22 C.F.R. § 62.8 *et seq.*................................................................................................7

22 C.F.R. § 62.9(f)(2) ................................................................................................23

22 C.F.R. § 62.10(a)(2) ........................................................................................23, 26

22 C.F.R. § 62.12 ........................................................................42

22 C.F.R. § 62.12(a) ..............................................................7, 43

22 C.F.R. § 62.22(b)(1)(ii) ........................................................23

22 C.F.R. § 62.22(d)(1) ..............................................................23

22 C.F.R. § 62.22(f)(1)(i) ...........................................................23

22 C.F.R. § 62.22(f)(1)(v) .......................................................9, 23

22 C.F.R. § 62.22(g)(1) .................................................................9

22 C.F.R. § 62.22(g)(2) .................................................................9

22 C.F.R. § 62.50 .........................................................................7

22 C.F.R. § 62.50(a) ..........................................7, 22, 28, 42

22 C.F.R. § 62.50(a)(1) ............................................11, 23, 29

22 C.F.R. § 62.50(a)(3) ................................................12, 24

22 C.F.R. § 62.50(b) ..............................................................7, 44

22 C.F.R. § 62.50(b)(1) ...........................................12, 28, 29

22 C.F.R. § 62.50(b)(1)(i) .............................................................7

22 C.F.R. § 62.50(b)(1)(ii) ...........................................................8

22 C.F.R. § 62.50(b)(1)(iii) ..........................................................7

22 C.F.R. § 62.50(b)(1)(iv) .........................................8, 42, 43

22 C.F.R. § 62.50(b)(2) ...........................................................8, 12

22 C.F.R. § 62.50(b)(3) .................................................................8

22 C.F.R. § 62.50(c)-(d) .............................................................44

22 C.F.R. § 62.50(c)-(e) ...............................................................7

Exchange Visitor Program – Sanctions and Termination, 72 Fed. Reg. 62112
(Nov. 2, 2007)...............................................................30, 34

Exchange Visitor Program, 57 Fed. Reg. 46679 (Oct. 9, 1992).............................32

Exchange Visitor Program, Final Rule, 58 Fed. Reg. 15180 (Mar. 19, 1993)..........6

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................................................16, 40

**OTHER AUTHORITIES**

Charles H. Koch, Jr. and William Murphy, 1 ADMIN. L. & PRAC. § 2:22
(3d ed. & Feb. 2014 update) ..........................................................44

http://j1visa.state.gov/wp-content/uploads/2014/06/Closed-Sanction-cases-
2006-to-Date-Master_Final.pdf (Apr. 7, 2014 rev.).....................................15

http://j1visa.state.gov/wp-content/uploads/2014/06/Closed-Sanction-cases-
2006-to-Date-Master_Final.pdf (last accessed Oct. 14, 2014).......................8

S. Rep. No. 1608, 84th Cong., 2d Sess. 2, *reprinted in*
1956 U.S.C.C.A.N. 2662 ...............................................................37

S. Rep. No. 79-752 (1945) ...............................................................33

ix

## JURISDICTIONAL STATEMENT

The District Court exercised federal question subject matter jurisdiction under 28 U.S.C. § 1331. The District Court dismissed all of Plaintiff ASSE International, Inc.'s claims on August 12, 2014. ASSE filed its Notice of Appeal on August 27, 2014. That notice was timely under Federal Rule of Appellate Procedure 4(a)(1)(B). The District Court's order was final because it dismissed each of ASSE's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the detailed regulations the State Department relied upon to

sanction Plaintiff ASSE, an Exchange Visitor Program sponsor, provide

meaningful standards to establish ASSE's right to judicial review over the

agency's decision and sanctions under the Administrative Procedure Act.

2.    Whether ASSE's right to procedural due process was violated when the

agency withheld exculpatory evidence, based its decision on *ex parte*

proceedings from which both it and ASSE were excluded, and withheld

evidence it relied upon to support the factual determinations justifying the

sanctions it imposed.

## INTRODUCTION

ASSE International, Inc. ("ASSE") is one of the private "program sponsors" responsible for creating and operating educational and cultural exchange programs for foreign visitors through the U.S. Government's Exchange Visitor Program ("EVP"). ASSE has a long history of facilitating international exchange programs. It was incorporated as a California-based non-profit in 1976, but it traces its roots to a people-to-people exchange program founded by the Swedish Ministry of Education in 1938. Licensed by an office within the State Department, sponsors like ASSE play an integral role in running the EVP. They develop their own exchange programs, recruit participants from abroad, screen and vet organizations to serve as U.S. hosts, and support program participants after their arrival in the United States.

In March 2014, the State Department sanctioned ASSE, alleging that one of its third party contractors, American Career Opportunity ("ACO"), violated EVP regulations in connection with a 31-year-old participant in an ASSE-sponsored exchange program. The agency concluded the participant spoke insufficient English for her program and hence had been improperly selected as an exchange visitor, and that ACO had improperly recruited and placed her to fulfill a labor need rather than to facilitate a genuine training program. It also charged that ACO and the participant's host company systematically harassed and threatened the

3

exchange visitor and her family after she complained about her working hours and pay. The agency relied on these charges to conclude that ASSE violated specific EVP regulations, including a requirement that it properly oversee third parties.

The sanctions have a profound effect on ASSE's capacity to operate as a program sponsor. They form a permanent part of ASSE's record with the State Department, potentially imperiling ASSE's continued sponsor designation. The sanctions have reduced the number of exchange visitors who may participate in ASSE-sponsored exchange programs by fifteen percent. And, most seriously, they would result in a substantial and potentially irreversible blow to ASSE's reputation and business goodwill if the State Department proceeds to post ASSE's name on its public list of "sanctioned sponsors."

ASSE's complaint alleges fundamental defects with the agency's sanctions decision. For one, the agency never produced a single piece of evidence to substantiate its charges that ASSE's third parties harassed and threatened an ASSE program participant. The agency's other determinations rested on mischaracterizations of the record evidence. And while ASSE was permitted a one-time paper response to oppose the agency's decision to impose sanctions, the agency withheld from ASSE the evidence it relied upon to support the harassment charge, crippling ASSE's capacity to offer a meaningful response. Consistent with

the agency's own representation that sponsors may seek judicial review of sanctions decisions, *infra* at 32, ASSE sued to challenge the sanctions.

The District Court dismissed ASSE's claims. It held that a narrow exception for action "committed to agency discretion" defeated the strong presumption that agency action is subject to judicial review, and thus refused to consider the merits of ASSE's APA challenge. The Court also dismissed ASSE's due process claim, holding that ASSE was accorded constitutionally-sufficient process.

This case presents issues of fundamental importance to the hundreds of private program-sponsors subject to the agency's regulatory sanctions power. Under the District Court's decision, these sponsors have no recourse to challenge final administrative action that can severely restrict or even terminate their participation in the EVP. The agency, according to the District Court, is permitted to take such action based on allegations and conclusory statements of wrongdoing, denying the sponsor an opportunity to respond meaningfully. And the implications of such a decision would reverberate well beyond the narrow context presented, insulating agency action of all types from even minimal judicial oversight. This is not the law.

## STATEMENT OF THE CASE

### 1. Regulatory Background

Congress established the Exchange Visitor Program ("EVP") in 1961 with the goal of promoting educational and cultural exchanges between the people of the United States and other nations. *See* Mutual Educational and Cultural Exchange Act of 1961, Pub. L. 87-256, § 101, 75 Stat. 527 (codified at 22 U.S.C. § 2451). The EVP authorizes a diversity of educational and cultural exchange programs for foreign visitors of all types, from au pairs to high school students. As relevant to this case, the EVP authorizes "work-based" occupational training programs designed to expose college graduates and others already in the workforce in their respective countries to "American techniques, methodologies, and expertise" in their particular field. *See* 22 C.F.R. § 62.2; *see also* 22 U.S.C. § 2452(a)(1)(B)(ii) (authorizing exchange programs for "trainees").

Though oversight of the EVP rests with the State Department's Office of Private Sector Exchange, the exchange programs themselves are "facilitated – indeed, largely conducted – by Agency-designated program sponsors who are responsible for the recruitment, placement, and supervision of exchange participants." *See* Exchange Visitor Program, Final Rule, 58 Fed. Reg. 15180 (Mar. 19, 1993). To become a sponsor, an organization must apply for and obtain designation from the State Department. *See* 22 C.F.R. §§ 62.5, 62.6. The agency

caps the number of participants in any given sponsor's programs by allocating the sponsor a set yearly supply of the "DS-2019" forms necessary for participants to certify their eligibility and obtain their visas to the United States. *See id.* § 62.12(a).

The regulations establish a comprehensive and detailed scheme of responsibilities and obligations that govern sponsors' implementation of the EVP. *See id.* § 62.8 *et seq*. They also establish a comprehensive framework for sanctioning sponsors that violate these detailed EVP regulations or engage in other defined sanctionable conduct. *Id*. § 62.50. Under these regulations, the Office of Exchange Coordination and Designation, a sub-office within the State Department's Office of Private Sector Exchange, may impose sanctions against a program sponsor only if it finds that the sponsor engaged in one or more of four specified "reason[s] for sanctions." *Id*. § 62.50(a). Upon a finding that the sponsor engaged in sanctionable conduct as defined by the regulations, the agency may suspend, revoke, or deny re-designation to a program sponsor. *See id*. § 62.50(c)-(e). It may also, "in its discretion and depending on the nature and seriousness of the violation," choose from a menu of so-called "lesser" sanctions. *Id*. § 62.50(b). These can include any combination of a written reprimand, *id*. § 62.50(b)(1)(i), requiring the sponsor to submit a "corrective action plan" to remedy the violation, *id*. § 62.50(b)(1)(iii), and up to a 15% reduction in the number of authorized

7

visitors who may participate in the sponsor's programs. *Id*. § 62.50(b)(1)(iv). In cases where the sponsor's conduct reflects "a pattern of violation[s]," the agency may also place the program sponsor on probation. *Id*. § 62.50(b)(1)(ii). All sanctioned sponsors are posted on a list maintained by the State Department on its EVP website. ER 115-16.[1] The posting, once made, is permanent. ER 107.

Sponsors subject to any of the "lesser" sanctions are permitted to submit a one-time paper response "in opposition to or mitigation of the sanction" which "may include additional documentary material." 22 C.F.R. § 62.50(b)(2). The agency may then "modify, withdraw, or confirm such sanction." *Id*. If the sanctions are confirmed, "[t]he decision of the Office is the final Department decision[.]" *Id*. § 62.50(b)(3).

### 2.  The Sanctions Imposed Against ASSE

For over 38 years, ASSE International has served as a leading EVP program sponsor. ER 81-82. Each year, thousands of exchange visitors from around the world participate in ASSE-sponsored programs. ER 112. Consistent with the regulations, ASSE – like many private EVP sponsors – engages the services of third parties to help recruit, place, and provide services to the exchange visitors who participate in its programs. ASSE thus contracted with a company called

---

[1] *See* http://j1visa.state.gov/wp-content/uploads/2014/06/Closed-Sanction-cases-2006-to-Date-Master_Final.pdf (last accessed Oct. 14, 2014). Pursuant to an agreement between the parties in this litigation, ASSE's posting has been temporarily removed. *See infra* at 15.

8

"American Career Opportunity" ("ACO") and engaged it as a third party to assist ASSE with exchange visitors from Japan. ER 84-85. As EVP regulations require, ASSE executed a written agreement with ACO which "outline[d] the obligations and full relationship between the sponsor and third party on all matters involving the administration of [ASSE's] exchange visitor program," *id.* § 62.22(g)(1), and ASSE "ascertain[ed]" that ACO was a "legitimate entit[y] within the context of [its] home country environment." *Id.* § 62.22(g)(2). Moreover, to ensure that ACO was "sufficiently educated on the goals, objectives, and regulations of the Exchange Visitor Program" and adhered to EVP regulations, *id.* § 62.22(f)(1)(v), ASSE provided extensive training to ACO personnel, including in-person sessions at ASSE's California headquarters. *See* ER 84-86.

ACO assisted ASSE with the recruitment and placement of a 31-year-old Japanese exchange visitor who began an ASSE-sponsored management training program with a restaurant/cafe called The Cream Pot in Waikiki, Hawaii. ER 26, 83, 88. After just over three weeks participating in her program, the exchange visitor contacted the State Department on February 7, 2012, to lodge a complaint regarding her training conditions. ER 52, 93. The next day, the exchange visitor contacted ASSE to express concern with the working hours and compensation at her training site. ER 92-93. The email did not mention any instances of harassment or threats. *Id.* ASSE staff immediately responded. *Id.* Though the trainee was

informed that ASSE maintained a 24-hour emergency hotline, she never made use of this service. ER 93. And by February 12, she broke off all contact with ASSE, refusing to answer its emails or phone calls. *Id*.

Though ASSE was excluded from the agency's investigation of the complaint and shielded from contacting the exchange visitor, ER 93, 96-97, ASSE took immediate steps to ascertain the exchange visitor's situation and render assistance. When the exchange visitor stopped responding to ASSE's emails and phone calls, ASSE filed a missing person's report and sought assistance from the Honolulu Police to locate her and ensure her wellbeing. ER 95. It also flew the exchange visitor's fellow trainee to ASSE's California headquarters and placed her in a new program. ER 95. Police interviewed her in connection with the missing person's report. When questioned, she told police that she had a positive experience training with her host company. And she stated that the exchange visitor who was allegedly harassed appeared happy and normal during the short time they spent training together. ER 29, 95. The police officer noted that her statements "appeared genuine." ER 29.

On November 22, 2013, more than twenty-one months after the exchange visitor first lodged her complaint with the State Department, the agency issued a notice to ASSE indicating its intent to impose sanctions ("Notice"). ER 60-78. The Notice charged ASSE with violating specific EVP regulations governing ASSE's

10

oversight of third parties, the exchange visitor's English ability, and her placement with the host organization. ER 62-64. The Notice thus indicated the State Department's intent to sanction ASSE for "violat[ing] one or more provisions" of the EVP regulations. ER 60, 62 (citing 22 C.F.R. § 62.50(a)(1)).

In addition, the Notice "determined that [the exchange visitor] was being harassed by third parties," including ACO and the exchange visitor's host company. ER 60, 64-65. The Notice, however, included no evidence to support this conclusion, and merely cited the exchange visitor's allegation during a closed-door meeting with agency officials that she "endured almost 30 separate instances of harassment, threats regarding her immigration status, and threats to her family." ER 61. No notes from this meeting or sworn statements from the exchange visitor were produced.

In lieu of supporting its conclusion that ACO harassed the trainee with evidence, the agency relied on the ostensible grant of a T ("trafficking") visa to the exchange visitor.[2] ER 65. T visa adjudication is an *ex parte* process in which neither the evidence submitted nor the grounds for a visa decision are made public. *See generally* 8 C.F.R. §§ 214.11(d) (Application procedures for T status), 214.11(l) (Review and decision on applications). And, as the agency later

---

[2] Recipients of T visas, *see* 8 U.S.C. § 1101(a)(15)(T), are accorded generous and highly unusual immigration benefits, including not only a path to permanent residency for themselves and their immediate family, but also for their siblings and parents. *See id.* §§ 1101(a)(15)(T)(ii)(II), 1255(l).

acknowledged, "it is the Department of Homeland Security not the Department of State that adjudicates T visas[.]" ER 45. Though the State Department claims that it "neither participated in, nor received any information regarding, the processing of any T visa" for the exchange visitor, ER 45, it relied on the visa's ostensible issuance to support sanctions against ASSE for allowing harassment. ER 67. Based largely on this "harassment" charge, the Notice included a charge that ASSE "[c]ommitted an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor." 22 C.F.R. § 62.50(a)(3); ER 60, 64-65.

Based on ASSE's alleged violations, the Notice indicated the agency's intent to issue a letter of reprimand, a requirement that ASSE submit a corrective action plan, and a 15% reduction in the number of exchange visitors ASSE was eligible to host each year, ER 65 – the maximum "lesser" sanctions absent a pattern of violations. *See* 22 C.F.R. § 62.50(b)(1).

Pursuant to 22 C.F.R. § 62.50(b)(2), ASSE was given ten days to submit a statement in opposition to, or mitigation of, the sanctions. ER 67. In its response, ASSE submitted evidence undermining the agency's finding that the exchange visitor "was completely lacking in English language skills." ER 62. Among the evidence ASSE submitted were college transcripts from an elite Japanese university reflecting that she successfully completed six English language courses,

the exchange visitor's emails to ASSE reflecting proficiency in English, and the trainee's own self-assessment that her English speaking and reading skills were "good." ER 89-90. It also contested the other findings of regulatory violations, pointing out errors in the agency's reasoning. However, because the agency failed to provide ASSE with any of the evidence it relied upon to find that third parties engaged in harassment, and failed to describe the harassment in any meaningful degree of detail, ASSE was unable to counter these allegations in its response.

On March 14, 2014, the agency issued a notice confirming its sanctions decision. ER 41-59 It dismissed ASSE's evidence regarding the trainee's English as "interesting as far as [it] go[es]." ER 42. And for the first time, it relied on an email from ASSE to the State Department on February 10, 2012 – just days after it had been notified of its trainee's complaint – that "[d]uring the time we spoke with [the trainee], her English appeared to be not at an acceptable level for the purpose of this program." ER 42 n.3.

By failing to provide ASSE notice that the agency intended to rely on this statement, ASSE was denied the chance to explain why the trainee's English may well have "*appeared*" insufficient to ASSE staff: unbeknownst to ASSE at the time, the trainee was represented by a Honolulu-based anti-trafficking NGO that would soon refuse ASSE any access to the trainee. ER 28. And just days later, the trainee would cease responding to ASSE's written offers of assistance entirely,

13

though they were fully translated into her native Japanese. ER 27, 28. Had ASSE been accorded an opportunity to respond to its alleged "admission," it could have explained that – left in the dark regarding the exchange visitor's associations and possible motivations in the early days of the investigation – it mistook the trainee's unwillingness to speak with ASSE staff for a language deficiency. By waiting until the final notice imposing sanctions to raise this issue, the agency never gave ASSE the opportunity to explain the genesis of its alleged "admission."

The final sanctions notice also confirmed the agency's finding that third parties engaged in "focused harassment" of the exchange visitor. ER 45. Though the original Notice of Intent included no evidence of harassment, the final sanctions notice faulted ASSE for failing to "address this harassment" in its response to the Department's Notice of Intent. *Id*. Based on these findings, the agency imposed the full panoply of penalties outlined in the Notice of Intent, and the final sanctions decision became part of ASSE's program file. ER 46. Pursuant to the agency's policy of posting all sanctioned sponsors on a list permanently published on the State Department's website, the agency posted ASSE's name, the date the sanctions were issued, and the following "description":

> [ASSE] [v]iolated regulations relating to selection criteria, sponsor obligations, and use of third parties; committed a serious act of omission or commission – including through a third party – which had the effect of endangering the health, safety, or welfare of an exchange visitor.

14

*See* http://j1visa.state.gov/wp-content/uploads/2014/06/Closed-Sanction-cases-2006-to-Date-Master_Final.pdf (Apr. 7, 2014 rev.). Pursuant to an agreement between the parties in this litigation, the agency temporarily removed ASSE from the list following ASSE's filing of a temporary restraining order application. *See infra* at 15.

### 3. District Court Proceedings

On April 7, 2014, ASSE filed this lawsuit. ER 79-123. ASSE challenged the agency's sanctions decision as arbitrary and capricious and not supported by substantial evidence. ER 101-106. It also alleged that the agency violated ASSE's right to due process when it withheld the evidence it relied upon to support its findings, failed to disclose or consider exculpatory evidence, and relied on *ex parte* testimony and the results of other *ex parte* proceedings to substantiate its factual findings. ER 107-109.[3]

After filing its Complaint, ASSE applied for a temporary restraining order. The TRO request asked the District Court to enjoin the agency from posting ASSE's name on its public list of sanctioned sponsors and from requiring ASSE to admit to the factual findings in the agency's sanctions decision through submission of a corrective action plan. Shortly thereafter, counsel for the parties stipulated to the relief ASSE sought in the TRO.

---

[3] ASSE also raised claims of improper rulemaking and improper retroactive application of agency policy, but it does not pursue those claims on appeal.

15

On June 30, 2014, the agency filed a motion to dismiss ASSE's Complaint. The motion argued that the sanctions imposed against ASSE were unreviewable because they fit a narrow exception to judicial review under the APA for action "committed to agency discretion by law" pursuant to 5 U.S.C. § 701(a)(2). It also moved to dismiss ASSE's other claims, including its due process claim, under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

The District Court held a hearing on the government's motion on August 11, 2014. One day later, the Court granted the agency's motion to dismiss. ER 1-16. While acknowledging the limited scope of the § 701(a)(2) exception under the APA, and that regulations can provide the requisite standards to enable judicial review, the Court held that the sanctions process regulations – including the specific EVP requirements ASSE was charged with violating – "do[] not limit the broad grant of discretionary authority provided to the State Department by the Congress." ER 7. It also concluded that review of the agency sanctions could have "serious foreign policy consequences." ER 9. The Court did not reach the merits of ASSE's APA claim, and also dismissed ASSE's due process claim on the ground that the one-time paper response accorded to ASSE was constitutionally sufficient. ER 12-15. ASSE filed a timely Notice of Appeal. ER 17.

Following ASSE's Notice of Appeal, the agency agreed to continue to forgo public posting of ASSE on its sanctioned sponsors list until March 2015, provided

that ASSE agree to join in a motion to expedite briefing and oral argument. 9th Cir. D.E. 7. The Court granted in part the parties' joint motion to expedite on September 23, 2014. *See* 9th Cir. D.E. 8.

## SUMMARY OF ARGUMENT

In dismissing ASSE's Complaint, the District Court overextended a narrow exception to judicial review for agency action committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2). The exception applies only in rare cases where a discretionary agency decision is un-cabined by any meaningful standards that would enable a court to review the agency's decision. The exception plainly does not bar review here where the agency was *required* to find that ASSE violated specific, detailed duties clearly defined by the EVP regulations before imposing sanctions.

These nondiscretionary findings, prerequisite to any sanctions, provide a court with adequate standards to determine whether the agency's sanctions decision is supported by substantial evidence. Moreover, none of the regulations the agency invoked to sanction ASSE make "foreign policy" a consideration, and the District Court offered no explanation for how judicial review of sanctions against a U.S. corporation would impinge on the Executive's foreign policy judgments. The Court had jurisdiction to hear ASSE's APA claim, and it

17

improperly bypassed merits review by dismissing the case on an inapplicable APA exception.

The District Court also erred in dismissing ASSE's due process claim. ASSE has a property interest in the agency's annual allocation of DS-2019 forms required to sponsor exchange visitors, as well as a property interest in its business goodwill. The agency's sanctions deprived ASSE of these property interests by removing 15% of previously-allocated trainees from its annual allotment, and by irrevocably damaging the goodwill ASSE accrued over nearly forty years by imputing allegations of threats and harassment onto ASSE, and intends to publish notice of these sanctions on its website. ASSE also has a protected liberty interest in its reputation under the "stigma-plus test" outlined in *Paul v. Davis*, 424 U.S. 693, 711 (1976), because the sanctions and their public posting will stigmatize ASSE in addition to directly impacting its rights.

Under the circumstances of this case, the one-time paper response in opposition to sanctions that ASSE was accorded failed the minimum necessary requirements to ensure that ASSE's due process rights were protected. The agency gutted the purpose of the limited one-time paper "hearing" ASSE was accorded – namely, to afford ASSE a meaningful opportunity to respond to the allegations – when it failed to disclose or even to describe in any meaningful detail the evidence of third-party harassment at the core of its sanctions decision and when it failed to

18

disclose to ASSE its intent to rely on allegedly adverse evidence regarding that trainee's English language proficiency until *after* ASSE submitted its response.

Compounding this violation, the agency relied on the unconfirmed outcome of *another* agency's *ex parte* proceedings – adjudication of a T visa application filed by the trainee – to support its own factual conclusion that ASSE's third-party contractor engaged in harassment and threats, even while admitting it had no knowledge of the basis for the T visa grant and providing no details regarding the alleged harassment that ASSE could rebut. ASSE had no way to know what evidence or allegations were submitted in connection with the T visa application; rather, ASSE (like the State Department) was left to guess about the evidence used to substantiate the visa's ostensible issuance. These and other defects in the process denied ASSE an opportunity meaningfully to oppose the agency's sanctions decision.

The levied sanctions' impact on ASSE is potentially catastrophic: Public posting of the sanctions threatens to destroy ASSE's standing in the EVP community and the sanctions would leave a permanent stain on ASSE's file with the agency. And yet the cost to the government of procedures providing adequate protection against erroneous deprivation would be minimal. Providing ASSE a genuine opportunity to confront the evidence against it is effectively costless. And any cost to the agency of supporting its factual findings with its *own* evidence

19

and investigation outweighs the risk of erroneous deprivation based on wholesale reliance on the outcome of *ex parte* proceedings conducted by other agencies. ASSE therefore properly stated a due process claim, and the District Court erred in dismissing it.

## ARGUMENT

## I. THE SANCTIONS IMPOSED AGAINST ASSE ARE SUBJECT TO JUDICIAL REVIEW.

The District Court dismissed ASSE's Complaint for lack of subject matter jurisdiction because it held that the sanctions imposed against ASSE were committed to agency discretion and thus immune from judicial review. This was error, because the regulatory provisions ASSE is charged with violating establish clear standards for judicial review of the sanctions decision.

The Court reviews the District Court's dismissal for lack of subject matter jurisdiction *de novo. See Zoggolis v. Wynn Las Vegas, LLC*, --- F.3d ----, 2014 WL 4694788, at *1 (9th Cir. 2014).

### A. The applicable regulations relied upon to sanction ASSE limit the agency's discretion sufficiently through standards that require judicial review.

The APA embodies a strong presumption that final agency actions are subject to judicial review. It provides that those who are "suffering legal wrong because of agency action . . . [are] entitled to judicial review thereof," 5 U.S.C. § 702, and applies "even if no statute specifically authorizes judicial review."

20

*ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir. 2004);*see also* 5 U.S.C. § 704

("[F]inal agency action for which there is no other adequate remedy in a court [is]

subject to judicial review."). "Congress's understanding in passing the APA was

that 'judicial review should be widely available to challenge the actions of federal

administrative officials.' The APA therefore creates a 'strong presumption that

Congress intends judicial review of administrative action.'" *Alto v. Black*, 738 F.3d

1111, 1124 (9th Cir. 2013) (quoting *Califano v. Sanders*, 430 U.S. 99, 104 (1977)

and *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)).

     In dismissing ASSE's Complaint, the District Court misapplied a "very

narrow" exception to judicial review for "agency action [that] is committed to

agency discretion by law." *See Citizens to Preserve Overton Park, Inc. v. Volpe*,

401 U.S. 402, 410 (1971); *see also* 5 U.S.C. § 701(a)(2). This exception bars

review only where there is "no meaningful standard against which to judge" the

challenged agency action. *See Pinnacle Armor, Inc. v. United States*, 648 F.3d

708, 719 (9th Cir. 2011) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

"As might be expected, the courts have restrained the reach of that exception, for it

is a beast that will swallow the whole of judicial review if given the opportunity."

*Senate of State of Cal. v. Mosbacher*, 968 F.2d 974, 976 (9th Cir. 1992).

     Thus, while statutory text or legislative history may supply the requisite

"meaningful standards" to enable review, so too may agency regulations and even

sub-regulatory guidance.[4] As the District Court recognized, even though the statutory language governing an agency program "may grant [the] agency 'unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which [a] court may review its exercise of discretion.'" *See* ER 6 (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (2003)).

The agency relied upon sanctions regulations in this case which provide the requisite "meaningful standards" to enable judicial review of ASSE's claim that the decision was arbitrary and capricious. Under the regulations, sanctions may be imposed against a program sponsor only if the agency determines that at least one of four specified "reason[s] for sanctions" exists. 22 C.F.R. § 62.50(a); *see also id*. § 62.50(b)(1) (permitting "lesser" sanctions only "upon a finding that the sponsor engaged in any of the acts or omissions set forth in paragraph (a) of this section").

In sanctioning ASSE, the agency invoked two of these specified grounds: First, it charged ASSE with "[v]iolat[ing] one or more provisions" of the extensive

---

[4] *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1082 (9th Cir. 2014) ("[E]ven where the substance or result of a decision is committed fully to an agency's discretion, 'a federal court has jurisdiction to review the agency action for abuse of discretion when the alleged abuse of discretion involves violation by the agency of . . . regulatory . . .  restrictions.'") (quoting *Ness Inv. Corp. v. USDA, Forest Service*, 512 F.2d 706, 715 (9th Cir. 1975)); *Beno v. Shalala*, 30 F.3d 1057, 1067 (9th Cir. 1994) (agency action reviewable in light of "detailed regulations"); *cf. Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) (agency refusal to grant discretionary relief reviewable where its discretion "has been legally circumscribed by various [agency] memoranda").

EVP regulations, 22 C.F.R. § 62.50(a)(1). Specifically, it charged ASSE with

violating regulations that: (1) require exchange visitors to speak sufficient English

to participate in their exchange program;[5] (2) prohibit placing exchange visitors to

fulfill a labor need rather than provide a genuine training program;[6] and (3) require

program sponsors to educate and oversee third parties they use.[7] Second, the Office

---

[5] *See* ER 43, 62, citing 22 C.F.R. §§ 62.10(a)(2) ("*Selection of exchange visitors.*
Sponsors shall provide a system to screen and select prospective exchange visitors
to ensure that they are eligible for program participation and that . . . (2) The
exchange visitor possesses sufficient proficiency in the English language to
participate in his or her program."), 62.22(d)(1) ("*Selection criteria.* In addition to
satisfying the general requirements set forth in § 62.10(a), sponsors must ensure
that trainees and interns have verifiable English language skills sufficient to
function on a day-to-day basis in their training environment.").

[6] *See* ER 44, *citing* 22 C.F.R. § 62.22(b)(1)(ii) ("Exchange Visitor Program training
and internship programs must not be used as substitutes for ordinary employment
or work purposes; nor may they be used under any circumstances to displace
American workers. The requirements in these regulations for trainees are designed
to distinguish between bona fide training, which is permitted, and merely gaining
additional work experience, which is not permitted. . . ."); ER 43, citing 22 C.F.R.
§ 62.22(f)(1)(i) ("*Obligations of training and internship program sponsors.*
Sponsors designated by the Department to administer training and internship
programs must . . . [e]nsure that trainees and interns are appropriately selected,
placed, oriented, supervised, and evaluated.").

[7] *See* ER 44, 62, citing 22 C.F.R. §§ 62.9(f)(2) ("*Staffing and support services.*
Sponsors shall ensure . . . [t]hat their employees, officers, agents, and third parties
involved in the administration of their exchange visitor programs are adequately
qualified, appropriately trained, and comply with the Exchange Visitor Program
regulations."), 62.22(f)(1)(v) ("*Obligations of training and internship program
sponsors.* Sponsors designated by the Department to administer training and
internship programs must: . . . Ensure that any host organizations and third parties
involved in the recruitment, selection, screening, placement, orientation, evaluation
for, or the provision of training and internship programs are sufficiently educated

---

charged ASSE with "commit[ting] an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor." *Id*. § 62.50(a)(3).

These "reason[s] for sanctions" expressly relied upon by the agency to sanction ASSE enable judicial review of the agency's decision because each regulatory provision establishes a clear, nondiscretionary prerequisite that must be satisfied before sanctions may be imposed. The cornerstone of ASSE's APA challenge is that the agency's findings of regulatory violations are unsupported by substantial evidence. These detailed regulatory standards which the agency has charged ASSE with violating easily allow a court to adjudicate ASSE's claim using substantial evidence review. *See, e.g.*, *Ursack Inc. v. Sierra Interagency Black Bear Group*, 639 F.3d 949, 958 n.4 (9th Cir. 2011) ("[T]he arbitrary and capricious standard incorporates the substantial evidence test"). ASSE's Complaint outlines the errors in the agency's conclusions that: the trainee was improperly placed to fulfill a labor need; she spoke insufficient English to participate in her program; ASSE inadequately supervised third parties; and ASSE's actions endangered the welfare of an exchange visitor. These factually-grounded, mandatory *prerequisites* to the imposition of sanctions provide the court with clear

on the goals, objectives, and regulations of the Exchange Visitor Program and adhere to all regulations set forth in this Part as well as all additional terms and conditions governing Exchange Visitor Program administration that the Department may from time to time impose.").

standards to determine whether the agency's sanctions decision was supported by substantial evidence.

The District Court appeared to acknowledge that the sanctions against ASSE were predicated on the agency's findings that ASSE violated specific regulatory requirements, *see* ER 9, but concluded that these requirements present "questions well beyond the scope of any meaningful review the Court could provide." *Id.* The District Court cites the example of "whether the exchange visitor in question here spoke sufficient English to participate in [her] Program" as an example of such a finding. But through review of the complete administrative record, the Court can easily determine whether the agency impermissibly "brushed aside the factors in [ASSE's] favor" which show that the trainee had more than sufficient degree of English language ability, as ASSE has alleged. *See Arrozal v. INS*, 159 F.3d 429, 433 (9th Cir. 1998) (reversing agency decision where it provided only a "cursory and generalized analysis of [the petitioner's] favorable factors").[8] Federal courts

_____

[8] Moreover, many of the violations outlined in Section II *infra* also support ASSE's APA claim, as the agency's failure to introduce into the record the evidence it relied upon to support its harassment charge and its reliance on *ex parte* proceedings leave its conclusions unsupported by the record. *See*, *e.g.*, *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) ("While inferences from the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice.") (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir.2004)); *see also Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 230 (1938) (the "assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational

are long accustomed to reviewing agency determinations such as those contained in the agency's Notice of Sanctions, such as the agency's off-hand dismissal of the trainee's English self-assessment, completion of university English courses, and email in English as "interesting as far as they go." ER 42.

Moreover, a reasoned conclusion that the trainee did not "possess[] sufficient proficiency in the English language *to participate in his or her program*" as the agency concluded, *see* 22 C.F.R. § 62.10(a)(2) (emphasis added), requires exchange-program-specific findings. Unless the record supports that the trainee was "*completely* lacking in English language skills," as the agency concluded its Notice of Intent, ER 62 (emphasis added), the agency was required to make findings regarding the degree of English required for the trainee's *specific exchange program*. These examples illustrate how the regulatory requirements themselves provide a court with standards to apply to determine whether the agency's decision was arbitrary and capricious.[9]

---

probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence.").

[9] Indeed, the District Court itself engaged the merits of the agency's English language finding, illustrating that the regulatory requirements the agency invoked provide adequate law to apply. ER 9 n.1. Of course, the Court erred in doing so on a motion to dismiss, without the benefit of the complete administrative record. *See Pinnacle Armor*, 648 F.3d at 721 ("If the district court intended to make a ruling on the merits of Pinnacle's APA claim, based on consideration of the full administrative record, it could have converted its decision into a Rule 56 summary judgment ruling. But it did not do so."). Nevertheless, the Court's analysis, while

26

The regulatory provisions concerned are far more conducive to judicial review than those at issue in other reviewable agency decisions, including an agency decision to revoke certification for body armor under highly technical regulatory standards, *see Pinnacle Armor, supra*, and the FAA's decision to deny an elderly pilot an exemption from the age requirements for a commercial pilot's license under a "public interest" standard. *See Keating v. FAA*, 610 F.2d 611, 612 (9th Cir. 1979). If these agency decisions provide meaningful standards, then an individual's English ability, or a party's intent in placing an individual with a host company, or whether a party's actions endanger the health, safety, or welfare of another, cannot be considered standards which judges are unequipped to handle. "In the rare instance [where courts] find that want of a meaningful standard precludes review, the case typically involves either an agency's power to manage its own docket, or issues where we have neither standards nor expertise, such when we are asked to review questions of national security, or an agency's decision to deny a discretionary federal loan." *See Pinnacle Armor*, 648 F.3d at 721. This is simply not such a case.

Indeed, the *only* discretion the sanctions regulations confer is for the agency to decide which particular menu of penalties to impose *after* it has determined that

---

premature and flawed, directly undermines its conclusion that courts can provide no meaningful review of the agency's determination that ASSE violated EVP regulations.

the sponsor engaged in sanctionable conduct. *See* 22 C.F.R. § 62.50(b)(1)

(allowing for sanctions "*upon a finding that the sponsor engaged in any of the acts or omissions set forth in paragraph (a)*" of the sanctions regulations, which define the "reason[s] for sanctions."). The District Court conflated the decision of what penalty to impose (which is discretionary but may also be reviewable) with the threshold finding that the sponsor engaged in violations (which is not discretionary at all). *See* ER 7 (stating that "[w]hether sanctions are issued, and which of the sanctions are issued, is wholly committed to the Department's judgment."). That the regulatory prerequisite for discretionary sanctions is a "finding" by the agency that the sponsor committed specified sanctionable conduct, 22 C.F.R. § 62.50(a), does not render the entire sanctions decision unreviewable. In *Beno v. Shalala*, this Court expressly rejected the argument that statutory language permitting agency action "to the extent and period *the Secretary finds* necessary" rather than "to the extent and period *necessary*" committed the action to agency discretion. 30 F.3d at 1066 (emphasis in original, parentheses omitted). Where, as here, the agency was bound to apply specified criteria in making its "findings," there are "meaningful standard[s] by which to judge the [agency's decision]." *Id.* at 1067.[10] After all,

---

[10] *See also Pinnacle Armor*, 648 F.3d at 720 ("[j]ust because a statute calls on the agency to exercise its 'judgment' in making its determination does not necessarily make an agency's action unreviewable"); *City of Los Angeles v. U.S. Dep't of Commerce*, 307 F.3d 859, 869 & n.6 (9th Cir. 2002) ("discretion to 'consider' whether sampling is feasible does not defy meaningful judicial review"); *Spencer*

"[t]he fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds." *See Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000).

Even the narrow portion of the sanctions regulation that is properly termed "discretionary" does not fall within 5 U.S.C. § 701(a)(2)'s narrow purview, because the decision is guided by an express requirement that the agency consider "the nature and seriousness of the violation." *See* 22 C.F.R. § 62.50(b)(1). This limitation on the agency's exercise of its prosecutorial discretion is important, given the sprawling regulatory scheme governing the EVP, and the fact that any violation of any EVP regulation constitutes a potential "reason for sanctions." *See* 22 C.F.R. § 62.50(a)(1). The requirement that the agency consider "the nature and seriousness of the violation" cabins this discretion and provides meaningful standards to review the sanctions imposed in a given case, even if the threshold finding of particular violations survives judicial scrutiny. The agency's announcement that it "seldom proposes formal sanctions without first engaging in

---

*Enters.,* 345 F.3d at 688 (though statute required "that the Attorney General should 'determine'" eligibility for visa, "this determination is guided by the statutory requirements" and hence reviewable); *County of Esmeralda, State of Nev. v. U.S. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991) (review available despite the fact that the statute "does not identify specific factors" for the agency to consider and provides such designation authority when "the Secretary feels" that doing so would "promote equity," among other considerations); *Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721, 727 (9th Cir. 1975) (provision which placed agency determination "in the judgment of the Secretary" is reviewable).

informal discussions seeking to bring the sponsor into voluntary compliance,"
*see* Exchange Visitor Program – Sanctions and Termination, 72 Fed. Reg. 62112,
62114 (Nov. 2, 2007), moreover, provides an additional baseline agency-
established principle to review the agency's choice of a particular menu of
sanctions for abuse of discretion. *See INS v. Yang*, 519 U.S. 26, 32 (1996) (an
agency can limit the scope of its discretion by announcing and applying "by settled
course of adjudication, a general policy by which its exercise of discretion will be
governed").

In sum, the very regulations which the Office relied upon to sanction ASSE
required the agency to make mandatory prerequisite findings of violations
governed by regulatory standards that provide a court with a clear basis to review
the agency decision under traditional APA review. Moreover, even the separate
decision of what sanctions to impose is reviewable because the discretion is
cabined by regulation and agency practice.

### B. The District Court erred in denying review based on the alleged "foreign policy" consequences of deciding ASSE's claims.

In addition to misconstruing the limited nature of the discretion the EVP
sanctions regulations confer, the District Court also determined that the sanctions
against ASSE are committed to agency discretion because – in its view – "the
issues involved here squarely implicate foreign relations[.]" ER 8. There is,
however, no express "foreign affairs" exception to review of final agency action

30

under the APA. And even if there were, judicial review of the sanctions decision

would in no way interfere with U.S. foreign relations or the purposes of the EVP.

> **i.** **The exception to judicial review for action "committed to agency discretion" does not encompass a "foreign affairs" exemption.**

The District Court's holding that ASSE's sanctions are committed to agency

discretion and hence unreviewable because of alleged "foreign affairs

consequences" of judicial review conflicts with the limited scope of the APA's

discretionary exception and the statute as a whole. As explained above, "[t]here is

a strong presumption that Congress intends judicial review of administrative

action," *Bowen*, 476 U.S. at 670, and the exception for action committed to agency

discretion is a very narrow one limited to cases where no meaningful standards

guide the agency's action. The District Court identified no authority to suggest that

merely because an agency undertakes action under a statutory framework that

involves foreign parties, that action is committed to agency discretion. So long as

meaningful standards guide the agency's action, as is the case here, the APA

requires judicial review regardless of whether the underlying action touches on

foreign affairs. *See*, *e.g.*, *Singh v. Clinton*, 618 F.3d 1085, 1092 (9th Cir. 2010)

(reversing State Department's decision to terminate immigrant-visa registration);

*Fox v. Clinton*, 684 F.3d 67, 69, 80 (D.C. Cir. 2012) (State Department's refusal

to issue a certificate of loss of U.S. citizenship to dual U.S./Israeli citizen was arbitrary and capricious).

Congress's failure to exempt agency action implicating "foreign affairs" in 5 U.S.C. § 701(a)(2) contrasts with the limitations Congress placed on the APA's *procedural* notice-and-comment rulemaking requirements. While the APA expressly exempts agencies from complying with the procedural notice and comment requirements for "foreign affairs function[s] of the United States," *see* 5 U.S.C. § 553(a)(1), there is no comparable exception to the APA's promise that "[a] person . . . adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." [11] This disparity confirms that the mere invocation of "foreign affairs," standing alone, is insufficient to defeat the APA's strong presumption of substantive judicial review for final agency action. It is well-established that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See Russello v. United States*, 464 U.S. 16, 23 (1983); *Corro-Barragan v. Holder*, 718 F.3d 1174, 1179 (9th Cir. 2013). This maxim of statutory construction applies with full force here; Congress clearly knew how exempt "foreign affairs

---

[11] The agency expressly declined to invoke the "foreign affairs function" exemption to notice and comment when it promulgated the rules governing the EVP. *See* Exchange Visitor Program, 57 Fed. Reg. 46679, 46693 (Oct. 9, 1992).

function[s]" when it drafted the APA, but it chose to do so only for the APA's procedural rulemaking requirements, without adding a similar express exception to the substantive review provisions.

The limited scope of the foreign affairs exception to the APA's rulemaking requirements that Congress *did* create underscores its intent that agencies not invoke "foreign affairs" broadly to evade the APA's protections. "The APA's legislative history indicates that the purpose of the foreign affairs exemption was to allow more cautious and sensitive consideration of those matters which 'so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences'" and that the exception "should be narrowly construed and only reluctantly countenanced." *See City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (citations omitted). Congress thus "admoni[shed] in the legislative history of the APA not to interpret the phrase 'foreign affairs function' . . . loosely . . . to mean any function extending beyond the borders of the United States." *Id.* (quoting S. Rep. No. 79-752, at 13 (1945)); *see also Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (noting that "even though immigration matters typically implicate foreign affairs," the foreign affairs exemption "would become distended" if broadly applied to all immigration-related decisions). The fact that Congress envisioned such limited application for the

express "foreign affairs functions" it *did* legislate with respect to the APA's procedures highlights the District Court's error in creating and applying an analogous extra-textual exemption to the APA's substantive review provisions.

In fact, the agency itself acknowledged that its sanctions decisions are subject to judicial review, even while it continued to assert – however dubiously – that the rule "involves a foreign affairs function of the United States." *See* Exchange Visitor Program – Sanctions and Termination, 72 Fed. Reg. 62112, 62114 (Nov. 2, 2007). In commentary to the latest amendment of the EVP sanctions regulations, the agency expressly justified the elimination of "trial-type procedures" for sponsors facing suspension or revocation, stating: "If the program sponsor is not satisfied with the decision ultimately reached . . . *it continues to have the same opportunities as before to seek relief in an appropriate court*." *Id.* (emphasis added).[12] The agency's admission here that its sanctions decisions are subject to judicial review confirms the District Court's error in shoehorning "foreign policy" in the "committed to agency discretion" APA exception.

---

[12] Defendants would have been aware that their assurances of judicial review were not mere lip service. Years before this rulemaking commentary, a district court reversed the agency's decision to sanction an EVP program sponsor, finding that it was unsupported by the record evidence. *See Nat'l Collegiate Rec. Svcs. v. Powell*, No. 02-cv-2676, *slip op.* at 12-13 (D.S.C. Nov. 27, 2002). The court ultimately concluded that the agency's position was not substantially justified, and awarded the sponsor over $150,000 in attorney's fees and costs. *See Nat'l Collegiate Rec. Svcs. v. Powell*, No. 02-cv-2676, Dkt. 44 (D.S.C. Mar. 23, 2004).

     **ii.    Judicial review of the sanctions imposed against ASSE would neither interfere with U.S. foreign relations nor require the Court to second-guess the Executive's foreign policy judgments.**

Even if 5 U.S.C. § 701(a)(2) incorporated a "foreign affairs" exemption *sub silentio*, the District Court's decision fails to explain how the agency action challenged in this case has any impact on the foreign relations of the United States. The agency sanctions at issue were imposed against a California public-benefit corporation whose principal officers are U.S. citizens, as the regulations require. No foreign national (much less a foreign government) is a party to the agency sanctions. And while the sanctions inflict serious harm to ASSE (including substantial reputational harm), they do not directly impact any individual exchange visitor.

To be sure, Congress authorized the EVP to help "assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world," *see* 22 U.S.C. § 2451, and one of the EVP's purposes is to "further[] the foreign policy objectives of the United States." 22 C.F.R. § 62.1(a). But Congress's lofty purpose of furthering public diplomacy when it authorized the EVP does not suggest that ASSE's challenge to the sanctions decision *itself* impinges on foreign affairs. Adjudication of ASSE's APA claim requires a court to do nothing of the sort. Far from "squarely implicat[ing] foreign relations" as the District Court concluded, ER 8, the agency's sanctions decision

involves allegations of specified regulatory violations by a *U.S. corporation*. Indeed, not-for-profit program sponsors like ASSE *must* be based in the United States as a matter of regulation. *See* 22 C.F.R. § 62.3(a)(3) (requiring private sponsors to be "citizens of the United States" as defined by regulation), *id.*. § 62.2 (defining "[c]itizen of the United States" in relevant part as a "[n]on-profit corporation . . . organized under the laws of the United States, or any state, the District of Columbia, or territory or possession of the United States . . ."). Moreover, none of the specific agency findings underpinning its sanctions decision involve weighing any foreign policy considerations. Evaluating the agency's determination that the exchange visitor spoke insufficient English for her training program; that she was impermissibly placed to fulfill a labor need; that ASSE's acts or omissions endangered her wellbeing; or that ASSE failed adequately to supervise one of its third parties, in no way requires a court to second-guess any of the agency's *foreign policy* judgments.

This Court's decision in *Abdelhamid v. Ilchert*, 774 F.2d 1447 (9th Cir. 1985), highlights the District Court's error in relying on "foreign affairs" to deny review of ASSE's claims. *Abdelhamid* concerned an exchange visitor's challenge to the denial of his request that the government waive the requirement that he return to his home country for two years following the completion of his exchange program in the United States. Congress introduced this foreign residency

requirement to ensure "that those individuals who are brought to the United States will return ... to their own ... country to impart to their friends and the society in which they live impressions of the United States and its culture," *see Chong v. Dir., USIA*, 821 F.2d 171, 178 (3d Cir. 1987) (quoting S. Rep. No. 1608, 84th Cong., 2d Sess. 2, *reprinted in* 1956 U.S.C.C.A.N. 2662, 2663), but it allowed EVP participants to obtain a waiver of this requirement upon a "favorable recommendation" of the agency then charged with administering the EVP. *See Abdelhamid*, 774 F.2d at 1448. Critically, the regulations guiding the agency's decision to grant or deny a waiver provided only that the agency should consider the "policy, program, and foreign relations aspects of the case." *Id*. at 1450.

While the Court in *Abdelhamid* held that the agency's refusal to waive the foreign residency requirement was committed to agency discretion, it relied not on the overall purpose of the EVP as a whole, but instead on the explicit language of the regulations that left the determination to the "policy, program, and foreign relations aspects of the case." The court found that this language, which expressly incorporated consideration of "foreign relations" concerns in the waiver decision, lacked the necessary meaningful standards to enable review. *See id*. (citing the waiver regulation and noting that the statute "does not expressly limit

[the agency's] discretion in deciding whether or not to make a favorable

recommendation").[13]

    *Abdelhamid* confirms that the agency sanctions in this case are reviewable:

Whereas the waiver denial in *Abdelhamid* was shielded from review because

the regulation governing the waiver *itself* defined unspecified and inherently

discretionary "policy, program, and foreign relations aspects of the case" as the

only substantive criteria, the sanctions regulations invoked against ASSE outline

detailed, nondiscretionary programmatic requirements. *Abdelhamid* reaffirmed that

"the test in *Overton Park* of when a reviewing court lacks jurisdiction due to the

provisions of § 701(a)(2), is not whether a statute viewed in the abstract lacks law

---

[13] Like *Abdelhamid*, every Court of Appeals to hold that EVP waiver adjudications are committed to agency discretion relied on the broad language of the waiver regulation, rather than any inherent "foreign policy" implications of the EVP generally. *See Slyper v. Attorney Gen.*, 827 F.2d 821, 824 (D.C. Cir. 1987) (distinguishing waiver provision from other State Department action with "explicit guidelines for its exercise of discretion" and noting that waiver "regulation is [] devoid of meaningful direction"); *Singh v. Moyer*, 867 F.2d 1035, 1039 (7th Cir. 1989) (judicial review over the agency's determination regarding "program, policy, and foreign relations aspects of the case" defined by the waiver regulation is "uniquely inappropriate"); *Dina v. Attorney Gen. of U.S.*, 793 F.2d 473, 476 (2d Cir. 1986) (citing regulation and stating that "[g]iven the fact that foreign policy concerns are integrally involved in waiver decisions, agency discretion in this area should be broad"). *But see Chong v. Dir., USIA*, 821 F.2d 171, 176 (3d Cir. 1987) (disagreeing with *Abdelhamid* and holding that the waiver "regulations provide sufficient guidance to make possible judicial review under an abuse of discretion standard."). The District Court cites dicta in *Chong* to justify denying review in ASSE's case (*see* ER 8), but the cited language appears in *Chong*'s *merits* analysis, *after* the court concluded that the "committed to agency discretion" APA exception did not preclude review of the agency's waiver decision. *See id.* at 177.

to be applied, but rather, whether '*in a given case*' there is no law to be applied." *Id*. at 1449 (quoting *Strickland v. Morton*, 519 F.2d 467, 470 (9th Cir. 1975)) (emphasis in original). *See also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1015 (9th Cir. 1987) ("determination[s] of whether agency actions implementing [statutory] directive are reviewable under section 701(a)(2) must be made on a case-by-case basis"). *Cf. Baker v. Carr*, 369 U.S. 186, 211-12 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."). Because the regulations in *this specific case* provide meaningful standards for review, the sanctions decision falls outside the purview of the narrow "committed to agency discretion" exception the District Court improperly invoked.

## II.   ASSE STATED A CLAIM THAT ITS DUE PROCESS RIGHTS WERE VIOLATED.

ASSE properly stated a claim that the agency deprived it of liberty and property interests without due process of law. Though the regulations allowed ASSE a one-time paper response to oppose sanctions, the agency deprived this response of any real meaning by withholding evidence and relying on *ex parte* testimony and proceedings which ASSE could not meaningfully confront or rebut. The agency also failed to disgorge evidence favorable to ASSE, including sworn statements taken by agency officials which directly undermine the factual conclusions underpinning the sanctions against ASSE. These defects render the

39

limited process ASSE was accorded constitutionally insufficient. The District Court erred in concluding to the contrary.

This Court reviews *de novo* the District Court's dismissal for failure to state a claim. *See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, --- F.3d ----, 2014 WL 4694802, at *4 (9th Cir. 2014). Moreover, "[i]n reviewing a motion to dismiss pursuant to Rule 12(b)(6), [the court] must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Id*.

## A. ASSE has protectible property and liberty interests.

Over the past thirty-eight years, ASSE has sponsored over 100,000 exchange visitors as a licensed EVP program sponsor. ER 82. The sanctions in this case not only threaten to deal a devastating blow to ASSE's reputation, but they also directly diminish ASSE's capacity to function as a program sponsor by reducing the number of exchange visitors allowed to participate in ASSE's programs each year. Both ASSE's allocation of exchange visitors and the considerable business goodwill it has accumulated over nearly 40 years give rise to interests protectible under the due process clause.

### i. ASSE has a property interest in its undiminished allocation of DS-2019 forms.

It is well-established "that the revocation of a license for cause [can]not occur before notice and a meaningful hearing [is] provided." *Alaska Airlines, Inc.*

40

*v. City of Long Beach*, 951 F.2d 977 (9th Cir. 1991) (citing *Bell v. Burson*, 402
U.S. 535, 541-42 (1971)); *see also Gerhart v. Lake County, Mont.*, 637 F.3d 1013,
1019 (9th Cir. 2011) (there is a constitutionally protected property interest in a
government license or permit where the "law creates a legitimate claim of
entitlement [by] impos[ing] significant limitations on the discretion of the decision
maker" (internal quotation marks and citation omitted)). In *Alaska Airlines*, the
Court held that air carriers "have a property interest in the number of flights they
have been allocated" under a municipality's noise control ordinance. *Id*. at 986.
While noting that an airline's flight allocation "is not the subject of an absolute
entitlement," the court held that the centrality of flight operations to airlines'
"livelihood" meant that the allocation could not be diminished "without that
procedural due process" required by the Constitution. *Id*. Thus, the government
cannot diminish for cause a licensed company's allocation of permits to conduct its
core business activities without according that organization due process.

Like the air carriers' interest in the number of daily flights permitted in
*Alaska Airlines*, ASSE has a property interest in the number of exchange visitors it
may sponsor annually. Under the EVP, the number of exchange visitors who may
participate in a sponsor's programs is capped by the total number of "DS-2019"
forms allocated by the agency to the sponsor annually, forms which must be issued
to the exchange visitor prior to her application for a visa and arrival in the United

41

States. *See* 22 C.F.R. § 62.12. The agency sanctions in this case reduced ASSE's allocation of DS-2019 forms by 15 percent, diminishing its capacity to sponsor exchange visitors. *Id.* § 62.50(b)(1)(iv). Like the flights that were "crucial to the continued functioning of the[] [air carriers'] enterprise" in *Alaska Airlines*, 951 F.2d at 986, ASSE relies on the DS-2019 forms to conduct its core function of sponsoring exchange visitors.

Moreover, the fact that the regulations governing ASSE's license to sponsor exchange visitors allow its allocation to be diminished or revoked only upon a showing that it engaged in specific "reason[s] for sanctions," 22 C.F.R. § 62.50(a), confirms ASSE's property interest. In *Thornton v. City of St. Helens*, 425 F.3d 1158 (9th Cir. 2005), this Court explained that "[a]t one pole, a state operating license that can be revoked only 'for cause' creates a property interest," while "[a]t the opposite pole" are licenses which the state has "unfettered discretion to approve or deny" which "do not create a property right." Whether a property right exists turns on whether "mandatory language [] restricts the discretion" of the reviewing body. *Id*. Under the EVP regulations, ASSE's allocation of the DS-2019 forms it requires to sponsor program participants consistent with the EVP regulations falls squarely on the "property interest" side of the described spectrum. While the agency allocates these forms to program sponsors on a yearly basis "tak[ing] into consideration the current size of the program and projected

expansion of the program . . .," 22 C.F.R. § 62.12(a), the allocation once

made may be reduced only through the imposition of sanctions. *See* 22 C.F.R.

§ 62.50(b)(1)(iv).

Furthermore, as described in Section I, *supra*, the regulatory provisions

ASSE is charged with violating adequately circumscribe the Department of State's

authority to impose sanctions. *See Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d

584, 588 (9th Cir. 1998) (specific, mandatory, and carefully circumscribed

requirements constrain discretion so as to give rise to a property interest); *cf. Doyle*

*v. City of Medford*, 606 F.3d 667, 674 (9th Cir. 2010) ("In some cases, even an

unparticularized criterion [there an evaluation of "the public interest"] may still

contribute to the creation of a property interest if it is accompanied by other, more

particularized criteria."). The regulations governing sanctions provide specific,

mandatory, and carefully circumscribed substantive restrictions upon the

Department's authority to impose sanctions, giving rise to a cognizable property

interest.[14] *Cf. Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980)

---

[14] This Court's decision in *Shanks v. Dressel*, 540 F.3d 1082 (9th Cir. 2008) makes plain ASSE's property interest in its license to sponsor exchange visitors. In *Shanks*, a neighborhood association brought suit contending that its procedural due process rights were violated by the city of Spokane's "alleged failure to enforce provisions of its zoning code intended to preserve historic districts." 540 F.3d at 1084. The court concluded that the plaintiff could not proceed with its claim for lack of a cognizable property interest because plaintiffs could point to no "language that 'impose[s] particularized standards . . . that significantly constrain' Spokane's discretion to issue the permits in question and would create a protected

("A property interest may be created if 'procedural' requirements are intended to operate as a significant substantive restriction on the basis for an agency's actions."); *see also* Charles H. Koch, Jr. and William Murphy, 1 ADMIN. L. & PRAC. § 2:22 (3d ed. & Feb. 2014 update) ("Administrative rules may . . . supply the necessary substantive standard to create an entitlement, a protected property interest.").

Moreover, the agency's decision to pursue "lesser" sanctions pursuant to 22 C.F.R. § 62.50(b), rather than outright suspension or revocation of ASSE's license under 22 C.F.R. §§ 62.50(c)-(d), does not negate ASSE's property interest in its complete and undiminished sponsor designation. After all, "the need for procedural due process may be triggered by something less than a total deprivation of property," *Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316, 1322 (3d Cir. 1982), as the Court's *Alaska Airlines* case clearly reflects. There, the Court found that airlines had a protected property interest in the number of flights they were permitted to operate daily; so too does ASSE have a property interest in maintaining its allocation of DS-2019 forms required to sponsor exchange visitors through its programs.

---

property interest in the permits' denial." *Id*. at 1091 (citing *Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1436 (9th Cir. 1986)). That is plainly not the case here, where the agency's sanctions regulations define in detail specific requirements for the sanctions that have diminished ASSE's license.

Finally, the agency sanctions' direct impact on ASSE's capacity to sponsor exchange visitors confirms ASSE's right to due process in the sanctions decision. In *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), the Supreme Court recognized "[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally." *Id.* at 788. As only parties *directly* affected by government action must be accorded due process, the Court held that nursing home residents have no "constitutional right to a hearing before a state or federal agency may revoke the home's authority to provide them with nursing care at government expense." 447 U.S. at 775; *see also Dumas v. Kipp*, 90 F.3d 386, 392 (9th Cir. 1996) (school had no protected property or liberty interest in its students' eligibility for government loans); *Castaneda v. USDA*, 807 F.2d 1478, 1480 (9th Cir. 1987) (store employee had no due process right in exclusion of store from government food stamp program because the employee "had no direct relationship with the government" and merely "complain[ed] of the indirect adverse consequences he suffered as a result of the government-store interaction"). Here, there is no question that the agency's sanctions against ASSE applied directly to its standing as a program sponsor. As ASSE was the "direct target of the government's [sanctions] decision," *Castaneda*, 807 F.2d at 1480, it

45

was entitled to constitutionally adequate process before sanctions could permissibly be imposed.

### ii. ASSE has a property and liberty interest in its reputation and business goodwill.

In addition to the property interest in its allocation of DS-2019 forms, ASSE has both a liberty and property interest in its unsullied reputation and the business goodwill it has developed over nearly four decades.

In *Soranno's Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), this Court noted that "California recognizes business goodwill as a property interest," and held – at least with respect to California corporations – that "[t]he goodwill of one's business is a property interest entitled to protection; the owner cannot be deprived of it without due process." *Id.* at 1316. As a California corporation, ER 81, ASSE has a property right under state law to the considerable business goodwill it has developed over its many years as a leading EVP program sponsor.

The agency's sanctions and its policy of publicly and permanently posting sponsors on its web-based "sanctioned sponsors" list threaten to destroy ASSE's reputation and its accumulated goodwill. In particular, the agency's finding that ASSE is responsible for acts that had the potential to endanger the welfare of a program participant could not be more damaging to the reputation and goodwill of a program sponsor. ASSE – like all program sponsors – depends on a network of program participants, including U.S-based volunteers and host organizations – to

46

create successful exchange programs. The State Department encourages these parties to view its list of "sanctioned sponsors" before choosing to volunteer for and associate with a given sponsoring organization. ER 115. Given the nature of the agency's findings in ASSE's case, its public and permanent posting of ASSE and a description of the sanctions for the world to see would have predictably disastrous consequences for ASSE's accumulated goodwill. ER 115-16.

In addition, ASSE has a protected liberty interest in its unsullied reputation under the Supreme Court's "stigma-plus" test first applied in *Paul v. Davis*, 424 U.S. 693, 711 (1976). Under the test, "a plaintiff must show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, plus the denial of some more tangible interest . . . , or the alteration of a right or status recognized by state law." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002). The "'plus' must be a deprivation of liberty or property by the state that directly affects the plaintiff's rights." *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004).

The agency's actions here meet the "stigma-plus" criteria because the nature of the allegations against ASSE ensure that the agency's public posting will irretrievably tarnish ASSE's good name in the eyes of parents, schools, volunteers, host companies, potential exchange visitors, and other EVP participants. ER 116. Nothing could be more stigmatizing to a program sponsor than a charge,

permanently posted, that its actions could have endangered the welfare of one of its own program participants. Moreover, the sanctions easily satisfy the requisite "plus," as they have a direct legal consequence on the number of exchange visitors ASSE is authorized to sponsor, require ASSE to submit a "corrective action plan," and form a part of ASSE's permanent file with the agency.

**B. The agency violated ASSE's due process rights by denying it the opportunity to confront adverse evidence, relying on *ex parte* proceedings to support its factual findings, and withholding the full basis for its sanctions until its final decision.**

The fundamental tenet of due process is "the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). The District Court dismissed ASSE's due process claim on the ground that the paper response it was accorded under the sanctions regulations is adequate process. It did so only by accepting fundamental defects in this paper "hearing" which deprived ASSE of a meaningful opportunity to respond to key factual allegations underpinning the agency's sanctions.

First, the agency never confronted ASSE with the evidence it relied upon to support the cornerstone of its sanctions decision: that third parties harassed and threatened the trainee. Nor did the Notice of Intent describe the evidence in a degree of detail that would have enabled ASSE to investigate and attempt to rebut the agency's findings. The agency's notice describes only what the trainee herself

48

alleged, and even then, only in the most general of terms.[15] And the Notice

described the agency's *conclusion* that ASSE's third parties engaged in acts of

threats and harassment. *See* Notice of Intent, ER 61 (stating agency's conclusion

that there were "acts of harassment and threats against [the trainee]" while

acknowledging that "ASSE did not directly participate" and "responded

immediately"); *id.* 64 ("[T]he actions of ASSE's third parties reflected back upon

ASSE . . . When [the trainee] requested assistance from third parties, she was

harassed and intimidated."). Missing entirely from the agency's Notice is the

critical link between the trainee's allegations and the agency's conclusions:

an accounting of the evidence the agency relied upon and the analysis it employed

to substantiate the trainee's allegations.

This Court's decision in *Kaur v. Holder*, 561 F.3d 957 (9th Cir. 2009),

makes clear that the agency violated ASSE's right to due process by failing to

provide ASSE a sufficient accounting of the evidence behind its harassment

charge. *Kaur* concerned the government's reliance on secret classified evidence in

deportation proceedings. The alien was provided with a "conclusory and opaque"

summary of the evidence as: "reliable, confidential sources have reported that [the

alien] conspired to engage in alien smuggling; has attempted to obtain fraudulent

---

[15] *See* Notice of Intent, ER 61 (the trainee "told of having endured almost 30 separate instances of harassment, threats regarding her immigration status, and threats to her family if she did not remain silent about the working conditions imposed by the three third parties").

documents; and has engaged in immigration fraud by conspiring to supply false documents for others." 561 F.3d at 961. The agency relied on the secret evidence to disqualify her for asylum. The Court held that this failure to adequately account for the evidence the government used to conclude that the alien engaged in illegal conduct violated the alien's right to due process. *Id*. at 962. The agency here committed an equivalent violation by providing ASSE with little more than a "conclusory and opaque" statement that its third parties engaged in harassment and threats, violating the time-honored "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959). *See also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) (due process requires "explanation of the [the] evidence"); *cf. Buckingham v. Secretary of USDA*, 603 F.3d 1073, 1083 (9th Cir. 2010) (procedures were adequate where agency "gave [plaintiff] timely notice of the charges against him, *as well as the evidence supporting those charges*") (emphasis added)); *Arnett v. Kennedy*, 416 U.S. 134, 137 (1974) (sufficient process where "the material on which the notice is based" was made available to claimant).

<u>Second</u>, rather than support its harassment charges using its own evidence, the agency relied on the results of *ex parte* administrative proceedings from which ASSE was excluded and which the agency claimed it knew nothing about. *See* Sanctions Notice, ER 45 ("As you know, it is the Department of Homeland Security [and] not the Department of State that adjudicates T visas, and the Office neither participated in, no received any information regarding, the processing of any T visa for [the exchange visitor]."). The trainee's T visa application was not *evidence* of harassment the agency could permissibly rely on; rather, it was a "black box" that neither ASSE – nor apparently the Department of State – could penetrate to determine what allegations were made, let alone what evidence the Department of Homeland Security relied upon to issue the visa.

The Office's abdication of its fact-finding duties to a separate administrative agency at ASSE's expense was particularly egregious where the underlying issues of threats and harassment turn largely on questions of credibility. In such circumstances, courts have recognized that the value of trial-type procedures is at its zenith. "The Supreme Court has explained that '[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.' An opportunity to confront and cross examine 'is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be

perjurers . . . .'" *Ching v. Mayorkas*, 725 F.3d 1149, 1156 (9th Cir. 2013) (quoting

*Goldberg*, 397 U.S. at 270; *Greene*, 360 U.S. at 496-97); *see also Pinnacle Armor*,

648 F.3d at 717 ("Formal hearings are particularly useful when witness credibility

is an issue and the decisionmaker must make judgments about witness

demeanor."); *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) (en banc)

("the fact that Oshodi submitted a written declaration outlining the facts of his

persecution is no response to the [administrative judge's] refusal to hear his

testimony"); *cf. Willner v. Comm. on Character*, 373 U.S. 96, 103 (1963)

("procedural due process often requires confrontation and cross-examination of

those whose word deprives a person of his livelihood").

Even assuming ASSE is not entitled to a hearing and an opportunity to

cross-examine witnesses, it was nonetheless entitled to an opportunity to confront

the evidence against it, even if through a "paper" hearing. *See Carnation Co. v.*

*Sec'y of Labor*, 641 F.2d 801, 803 (9th Cir. 1981) ("Procedural due process

requires that a party against whom an agency has proceeded be allowed to rebut

evidence offered by the agency if that evidence is relevant."); *Ralpho v. Bell*,

569 F.2d 607, 628 (D.C. Cir. 1977) ("An opportunity to meet and rebut evidence

utilized by an administrative agency has long been regarded as a primary requisite

of due process."). By relying on *ex parte* DHS proceedings from which ASSE was

excluded by law (and of which the agency itself disavowed knowledge), ASSE was

denied its fundamental right to know and confront the evidence used to justify the sanctions against it.

Third, the agency failed to consider or disclose exculpatory evidence that substantially undermined the agency's harassment charge. Law enforcement officials interviewed the complainant's fellow trainee, who reported only positive experiences regarding her training placement. She also reported that her co-trainee who raised allegations of threats and harassment in fact appeared happy during her short time with the host company. ER 29, 95. The police officer noted in his report that this fellow trainee's statements "appeared genuine." ER 29. ASSE submitted this evidence in response to the Notice of Intent, but the final sanctions decision gives no indication that the agency considered this exculpatory evidence in reaching its final decision. Moreover, the Department had the opportunity to conduct its own interview of fellow trainee during the 21 month interval between the exchange visitor's initial complaint and the agency's Notice of Intent. Yet the agency provided no notes of any such interview to ASSE, nor makes any mention of such an interview in either its Notice of Intent or final sanctions decision.

Fourth, with respect to the evidence the agency *did* ultimately rely upon, the agency failed to disclose in its initial Notice of Intent to Impose Sanctions the complete evidentiary basis for its findings, denying ASSE an opportunity to respond. For example, to support its finding that the exchange visitor spoke

insufficient English, the agency in its final decision relied on a supposed "concession" by ASSE that the trainee's English "appeared" insufficient for her program. ER 42 n.3. Had ASSE been provided notice that the agency intended to rely on this statement prior to a final decision by the agency, it could have explained – as it has here and in the district court – that the trainee's *apparent* lack of English ability more likely reflected instructions by the anti-trafficking organization representing her not to speak with ASSE staff. By relying on this "admission" in its final sanctions notice, the agency denied ASSE the opportunity to offer any meaningful response.

Fifth, the agency relied not only on *ex parte* proceedings, but also on *ex parte* testimony, worsening the agency's refusal to provide the underlying evidence to ASSE. Robust procedures are particularly important "where the evidence consists of testimony of individuals" rather than solely "documentary evidence." *Greene*, 360 U.S. at 496. Here, the agency relied heavily on *ex parte* witness testimony to support key factual findings adverse to ASSE. *See, e.g.*, Notice of Intent, ER 61 (the trainee "*told* of having endured almost 30 separate instances of harassment, threats") (emphasis added); Sanctions Notice, ER 42 (basing English language finding in part on agency employee's recollection of hearsay from law enforcement officials).  Under *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986), *ex parte* communications contributing to an agency's decision must be

evaluated regarding "the gravity of the ex parte communication, whether the communication may have influenced the decision, whether the party making the communication benefited from the decision, whether opposing parties knew of the communication and had an opportunity to rebut, and whether vacation and remand of the decision would serve a useful purpose." *Id.* at 1436. A significant portion of the evidence used to impose sanctions on ASSE was shielded from rebuttal, rendering these *ex parte* communications impermissible grounds for the sanctions against ASSE.

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court established criteria for determining whether an administrative hearing is consistent with due process. *Mathews* requires a balancing of: (1) the private interest affected by official action; (2) the risk of erroneously depriving this interest by the procedures used, combined with the probable value of additional procedural safeguards; and (3) the government's interest, including fiscal and administrative burdens, that additional or substitute procedures would entail. Under *Mathews*, the substantial limitations on ASSE's capacity to respond to the sanctions decision do not pass constitutional muster.

ASSE's private interest weighs heavily in favor of greater procedural protections than were afforded by the agency in this case. The District Court dismissed the impact of the sanctions imposed against ASSE, stating that they

"do not deprive it of its ability to meaningfully participate in the [EVP]." ER 15. But the District Court's conclusory statement is belied by the serious consequences that flow from the sanctions. First, the decision itself and the findings on which the sanctions were based become a permanent part of the sponsor's file with the agency. *See* Notice of Sanctions, ER 46 ("Copies of this letter and all related documentation shall become part of the ASSE program file"). As the sponsor's record must be considered when the agency makes a determination whether it will re-designate ASSE, *see* 22 C.F.R. § 62.7(c) (providing in relevant part that in determining whether to re-designate a sponsor, the Department "shall" take "into account the sponsor's annual reports and other documents reflecting its record as an exchange visitor program sponsor"), the sanctions decision imperils ASSE's prospects of re-designation.

In addition, the agency's policy of posting *all* sanctioned sponsors on a public list it maintains on its website threatens to destroy ASSE's professional relationships and its nearly 40 years of accumulated goodwill with the hosts, recruiters, volunteers, and prospective exchange visitor candidates ASSE relies upon to run successful exchange programs. ER 113-14. As a description of the specific sanctions imposed and the reasons for the sanctions accompany each sponsor's name on the list, the serious charges of wrongdoing by ASSE's third parties that the agency imputed onto ASSE would make public posting particularly

damaging to ASSE standing and its reputation in the EVP community. The posting is permanent, leaving ASSE with no recourse to petition for removal. ER 105. The private interest here is a weighty, constitutionally protected property interest. *See Marshall v. Kleppe*, 637 F.2d 1217 (9th Cir. 1980) (Fifth Amendment shields corporate as well as individual property against federal action in violation of the Due Process clause), *overruled on other grounds by Van Strum v. Lawn*, 940 F.2d 406 (9th Cir. 1991).

The government's interest in denying ASSE the process necessary to enable it to mount a meaningful challenge to the agency's factual findings is minimal. The cost of producing the materials it withheld from ASSE is negligible. Indeed, such production furthers the public interest. If the agency has evidence to support its factual conclusion that a trainee was harassed and threatened by a sponsor's third parties, it would further the EVP's goals to inform the sponsor of that conduct to help it prevent repeat occurrences. To the extent the record does not survive rebuttal by the affected sponsor, unjust (and unnecessary) sanctions are avoided. Due process demands more than the empty opportunity to respond ASSE was accorded here.

## CONCLUSION

For the foregoing reasons, the Court should reverse the District Court's order dismissing ASSE's Complaint and remand the case for consideration of ASSE's APA and due process claims.

Dated: October 14, 2014

Respectfully submitted,
/s/ Ira J. Kurzban
Ira J. Kurzban
Kurzban Kurzban Weinger Tetzeli and Pratt, P.A.
2650 S.W. 27th Avenue, Ste. 200
Miami, Florida 33133
Tel. No. (305) 444-0060

*Attorney for Appellant*

**<u>CERTIFICATE OF COMPLIANCE</u>**
**<u>WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B)</u>**

I HEREBY CERTIFY that this brief complies with the type-volume

limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate

Procedure. This brief uses a proportional typeface and 14-point font, and contains

13,697 words.

Dated: October 14, 2014           Respectfully submitted,

                                 /s/ Ira J. Kurzban
                                 Ira J. Kurzban

## <u>STATEMENT OF RELATED CASES</u>
## <u>PURSUANT TO NINTH CIRCUIT RULE 28-2.6</u>

Appellant is unaware of any pending related case in this Court

# ADDENDUM
## Pursuant to Circuit Rule 28-2.7

**ADDENDUM PURSUANT TO CIRCUIT RULE 28-2.7**
(Case No. 14-56402)

**Federal Regulations**                                                       **Page**

22 C.F.R. § 62.2, Definitions, *Citizen of the United States* ....................A1

22 C.F.R. § 62.3, Sponsor Eligibility........................................................A2

22 C.F.R. § 62.9(f), General obligations of sponsors, Staffing and Support Services ........................................................................................A2

22 C.F.R. § 62.10, Program Administration.............................................A2

22 C.F.R. § 62.12, Control of Forms DS-2019........................................A4

22 C.F.R. § 62.22(b), Trainees and Interns, Purpose..............................A6

22 C.F.R. § 62.22(d), Trainees and Interns, Selection Criteria ..............A7

22 C.F.R. § 62.22(f), Trainees and Interns, Obligations of Training and Internship Program Sponsors.......................................................A8

22 C.F.R. § 62.22(g), Trainees and Interns, Use of Third Parties .........A9

22 C.F.R. § 62.50, Sanctions .................................................................A11

**22 C.F.R. § 62.2, Definitions,** *Citizen of the United States*

*Citizen of the United States* means:

**(1)** An individual who is a citizen of the United States or one of its territories or possessions, or who has been lawfully admitted for permanent residence, within the meaning of section 101(a)(20) of the Immigration and Nationality Act; or

**(2)** A general or limited partnership created or organized under the laws of the United States, or of any state, the District of Columbia, or a territory or possession of the United States, of which a majority of the partners are citizens of the United States; or

**(3)** A for-profit corporation, association, or other legal entity created or organized under the laws of the United States, or of any state, the District of Columbia, or a territory or possession of the United States, which:

> **(i)** Has its principal place of business in the United States, and

> **(ii)** Has its shares or voting interests publicly traded on a U.S. stock exchange; or, if its shares or voting interests are not publicly traded on a U.S. stock exchange, it shall nevertheless be deemed to be a citizen of the United States if a majority of its officers, Board of Directors, and its shareholders or holders of voting interests are citizens of the United States; or

**(4)** A non-profit corporation, association, or other legal entity created or organized under the laws of the United States, or any state, the District of Columbia, or territory or possession of the United States; and

> **(i)** Which is qualified with the Internal Revenue Service as a tax-exempt organization pursuant to § 501(c) of the Internal Revenue Code; and

> **(ii)** Which has its principal place of business in the United States; and

> **(iii)** In which a majority of its officers and a majority of its Board of Directors or other like body vested with its management are citizens of the United States; or

**(5)** An accredited college, university, or other post-secondary educational institution created or organized under the laws of the United States, or of any state, including a county, municipality, or other political subdivision thereof, the District of Columbia, or of a territory or possession of the United States; or

**(6)** An agency of the United States, or of any state or local government, the District of Columbia, or a territory or possession of the United States.

A1

**22 C.F.R. § 62.3, Sponsor Eligibility**

**(a)** Entities eligible to apply for designation as a sponsor of an exchange visitor program are:

> **(1)** United States local, state and federal government agencies;

> **(2)** International agencies or organizations of which the United States is a member and which have an office in the United States; or

> **(3)** Reputable organizations which are "citizens of the United States," as that term is defined in § 62.2.

**(b)** To be eligible for designation as a sponsor, an entity is required to:

> **(1)** Demonstrate, to the Department of State's satisfaction, its ability to comply and remain in continual compliance with all provisions of part 62; and

> **(2)** Meet at all times its financial obligations and responsibilities attendant to successful sponsorship of its exchange program.

**22 C.F.R. § 62.9(f), General obligations of sponsors, Staffing and Support Services**

Sponsors shall ensure:

**(1)** Adequate staffing and sufficient support services to administer their exchange visitor programs; and

**(2)** That their employees, officers, agents, and third parties involved in the administration of their exchange visitor programs are adequately qualified, appropriately trained, and comply with the Exchange Visitor Program regulations.

**22 C.F.R. § 62.10, Program Administration**

Sponsors are responsible for the effective administration of their exchange visitor programs. These responsibilities include:

**(a)** *Selection of exchange visitors.* Sponsors shall provide a system to screen and select prospective exchange visitors to ensure that they are eligible for program participation, and that:

A2

(**1**) The program is suitable to the exchange visitor's background, needs, and experience; and

(**2**) The exchange visitor possesses sufficient proficiency in the English language to participate in his or her program.

(**b**) *Pre-arrival information.* Sponsors shall provide exchange visitors with pre-arrival materials including, but not limited to, information on:

(**1**) The purpose of the Exchange Visitor Program;

(**2**) Home-country physical presence requirement;

(**3**) Travel and entry into the United States;

(**4**) Housing;

(**5**) Fees payable to the sponsor;

(**6**) Other costs that the exchange visitor will likely incur (e.g., living expenses) while in the United States;

(**7**) Health care and insurance; and

(**8**) Other information which will assist exchange visitors to prepare for their stay in the United States.

(**c**) *Orientation.* Sponsors shall offer appropriate orientation for all exchange visitors. Sponsors are encouraged to provide orientation for the exchange visitor's immediate family, especially those who are expected to be in the United States for more than one year. Orientation shall include, but not be limited to, information concerning:

(**1**) Life and customs in the United States;

(**2**) Local community resources (e.g., public transportation, medical centers, schools, libraries, recreation centers, and banks), to the extent possible;

(**3**) Available health care, emergency assistance, and insurance coverage;

(**4**) A description of the program in which the exchange visitor is participating;

(**5**) Rules that the exchange visitors are required to follow under the sponsor's program;

(**6**) Address of the sponsor and the name and telephone number of the responsible officer; and

A3

(**7**) Address and telephone number of the Exchange Visitor Program Services of the Department of State and a copy of the Exchange Visitor Program brochure outlining the regulations relevant to the exchange visitors.

(**d**) *Form DS-2019.* Sponsors shall ensure that only the responsible officer or alternate responsible officers issue Forms DS-2019;

(**e**) *Monitoring of exchange visitors.* Sponsors shall monitor, through employees, officers, agents, or third parties, the exchange visitors participating in their programs. Sponsors shall:

(**1**) Ensure that the activity in which the exchange visitor is engaged is consistent with the category and activity listed on the exchange visitor's Form DS-2019;

(**2**) Monitor the progress and welfare of the exchange visitor to the extent appropriate for the category; and

(**3**) Require the exchange visitor to keep the sponsor apprised of his or her address and telephone number, and maintain such information.

(**f**) *Requests by the Department of State.* Sponsors shall, to the extent lawfully permitted, furnish to the Department of State within a reasonable time all information, reports, documents, books, files, and other records requested by the Department of State on all matters related to their exchange visitor programs.

(**g**) *Inquiries and investigations.* Sponsors shall cooperate with any inquiry or investigation that may be undertaken by the Department of State.

(**h**) *Retention of records.* Sponsors shall retain all records related to their exchange visitor program and exchange visitors for a minimum of three years.

## 22 C.F.R. § 62.12, Control of Forms DS-2019

Forms DS-2019 shall be used only for authorized purposes. To maintain adequate control of Forms DS-2019, responsible officers or alternate responsible officers shall:

(**a**) *Requests.* Submit written requests to the Department of State for a one-year supply of Forms DS-2019, and allow four to six weeks for the distribution of these forms. The Department of State has the discretion to determine the number of Forms DS-2019 to be sent to a sponsor. The Department of State will take into consideration the current size of the program and the projected expansion of the program in the coming 12 months. If requested, the Department of State will

A4

consult with the responsible officer prior to determining the number of Forms DS-2019 to be sent to the sponsor. Additional forms may be requested later in the year if needed by the sponsor.

**(b)** *Verification.* Prior to issuing Form DS-2019, verify that the exchange visitor:

> **(1)** Is eligible, qualified, and accepted for the program in which he or she will be participating;

> **(2)** Possesses adequate financial resources to complete his or her program; and

> **(3)** Possesses adequate financial resources to support any accompanying dependents.

**(c)** *Issuance of Form DS-2019.* Issue the Form DS-2019 only so as to:

> **(1)** Facilitate the entry of a new participant of the exchange visitor program;

> **(2)** Extend the stay of an exchange visitor;

> **(3)** Facilitate program transfer;

> **(4)** Replace a lost or stolen Form DS-2019;

> **(5)** Facilitate entry of an exchange visitor's alien spouse or minor unmarried children into the United States separately;

> **(6)** Facilitate re-entry of an exchange visitor who is traveling outside the United States during the program;

> **(7)** Facilitate a change of category when permitted by the Department of State; and

> **(8)** Update information when significant changes take place in regard to the exchange visitor's program, such as a substantial change in funding or in the location where the program will take place.

**(d)** *Safeguards.*

> **(1)** Store Forms DS-2019 securely to prevent unauthorized use;

> **(2)** Prohibit transfer of any blank Form DS-2019 to another sponsor or other person unless authorized in writing (by letter or facsimile) by the Department of State to do so;

> **(3)** Notify the Department of State promptly by telephone (confirmed promptly in writing) or facsimile of the document number of any completed Form DS-2019 that is presumed lost or stolen or any blank Form DS-2019 lost or stolen; and

A5

(**4**) Forward the completed Form DS-2019 only to an exchange visitor, either directly or via an employee, officer, or agent of the sponsor, or to an individual designated by the exchange visitor.

(**e**) *Accounting.*

(**1**) Maintain a record of all Forms DS-2019 received and/or issued by the sponsor;

(**2**) Destroy damaged and unusable Form DS-2019 on the sponsor's premises after making a record of such forms (e.g. forms with errors or forms damaged by a printer); and

(**3**) Request exchange visitors and prospective exchange visitors to return any unused Form DS-2019 sent to them and make a record of Forms DS-2019 which are returned to the sponsor and destroy them on the sponsor's premises.

## 22 C.F.R. § 62.22(b), Trainees and Interns, Purpose

(**1**)

(**i**) The primary objectives of the programs offered under these regulations are to enhance the skills and expertise of exchange visitors in their academic or occupational fields through participation in structured and guided work-based training and internship programs and to improve participants' knowledge of American techniques, methodologies, and technology. Such training and internship programs are also intended to increase participants' understanding of American culture and society and to enhance Americans' knowledge of foreign cultures and skills through an open interchange of ideas between participants and their American associates. A key goal of the Fulbright-Hays Act, which authorizes these programs, is that participants will return to their home countries and share their experiences with their countrymen.

(**ii**) Exchange Visitor Program training and internship programs must not be used as substitutes for ordinary employment or work purposes; nor may they be used under any circumstances to displace American workers. The requirements in these regulations for trainees are designed to distinguish between *bona fide* training, which is permitted, and merely gaining additional work experience, which is not permitted. The requirements in these regulations for interns are designed to distinguish between a period of

work-based learning in the intern's academic field, which is permitted (and which requires a substantial academic framework in the participant's field), and unskilled labor, which is not.

**(2)** In addition, a specific objective of the new internship program is to provide foreign nationals who are currently enrolled full-time and pursuing studies at a degree- or certificate-granting post-secondary academic institution or graduated from such an institution no more than 12 months prior to their exchange visitor program begin date a period of work-based learning to allow them to develop practical skills that will enhance their future careers. Bridging the gap between formal education and practical work experience and gaining substantive cross-cultural experience are major goals in educational institutions around the world. By providing training opportunities for current foreign students and recent foreign graduates at formative stages of their development, the U.S. Government will build partnerships, promote mutual understanding, and develop networks for relationships that will last through generations as these foreign nationals move into leadership roles in a broad range of occupational fields in their own societies. These results are closely tied to the goals, themes, and spirit of the Fulbright-Hays Act.

## 22 C.F.R. § 62.22(d), Trainees and Interns, Selection Criteria

**(1)** In addition to satisfying the general requirements set forth in § 62.10(a), sponsors must ensure that trainees and interns have verifiable English language skills sufficient to function on a day-to-day basis in their training environment. Sponsors must verify an applicant's English language proficiency through a recognized English language test, by signed documentation from an academic institution or English language school, or through a documented interview conducted by the sponsor either in-person or by videoconferencing, or by telephone if videoconferencing is not a viable option.

**(2)** Sponsors of training programs must verify that all potential trainees are foreign nationals who have either a degree or professional certificate from a foreign post-secondary academic institution and at least one year of prior related work experience in their occupational field acquired outside the United States or five years of work experience in their occupational field acquired outside the United States.

**(3)** Sponsors of internship programs must verify that all potential interns are foreign nationals who are currently enrolled full-time and pursuing studies in their

A7

advanced chosen career field at a degree- or certificate-granting post-secondary academic institution outside the United States or graduated from such an institution no more than 12 months prior to their exchange visitor program begin date.

## 22 C.F.R. § 62.22(f), Trainees and Interns, Obligations of Training and Internship Program Sponsors

**(1)** Sponsors designated by the Department to administer training and internship programs must:

> **(i)** Ensure that trainees and interns are appropriately selected, placed, oriented, supervised, and evaluated;

> **(ii)** Be available to trainees and interns (and host organizations, as appropriate) to assist as facilitators, counselors, and information resources;

> **(iii)** Ensure that training and internship programs provide a balance between the trainees' and interns' learning opportunities and their contributions to the organizations in which they are placed;

> **(iv)** Ensure that the training and internship programs are full-time (minimum of 32 hours a week); and

> **(v)** Ensure that any host organizations and third parties involved in the recruitment, selection, screening, placement, orientation, evaluation for, or the provision of training and internship programs are sufficiently educated on the goals, objectives, and regulations of the Exchange Visitor Program and adhere to all regulations set forth in this Part as well as all additional terms and conditions governing Exchange Visitor Program administration that the Department may from time to time impose.

**(2)** Sponsors must certify that they or any host organization acting on the sponsor's behalf:

> **(i)** Have sufficient resources, plant, equipment, and trained personnel available to provide the specified training and internship program;

> **(ii)** Provide continuous on-site supervision and mentoring of trainees and interns by experienced and knowledgeable staff;

> **(iii)** Ensure that trainees and interns obtain skills, knowledge, and competencies through structured and guided activities such as classroom training, seminars, rotation through several departments, on-the-job training,

attendance at conferences, and similar learning activities, as appropriate in specific circumstances;

**(iv)** Conduct periodic evaluations of trainees and interns, as set forth in § 62.22(l);

**(v)** Do not displace full- or part-time or temporary or permanent American workers or serve to fill a labor need and ensure that the positions that trainees and interns fill exist primarily to assist trainees and interns in achieving the objectives of their participation in training and internship programs; and

**(vi)** Certify that training and internship programs in the field of agriculture meet all the requirements of the Fair Labor Standards Act, as amended (29 U.S.C. 201 *et seq.*) and the Migrant and Seasonal Agricultural Worker Protection Act, as amended (29 U.S.C. 1801 *et seq.*).

**(3)** Sponsors or any third parties acting on their behalf must complete thorough screening of potential trainees or interns, including a documented interview conducted by the sponsor either in-person or by videoconferencing, or by telephone if videoconferencing is not a viable option.

**(4)** Sponsors must retain all documents referred to in § 62.22(f) for at least three years following the completion of all training and internship programs. Documents and any requisite signatures may be retained in either hard copy or electronic format.

## 22 C.F.R. § 62.22(g), Trainees and Interns, Use of Third Parties

**(1)** *Sponsors use of third parties.* Sponsors may engage third parties (including, but not limited to host organizations, partners, local businesses, governmental entities, academic institutions, and other foreign or domestic agents) to assist them in the conduct of their designated training and internship programs. Such third parties must have an executed written agreement with the sponsor to act on behalf of the sponsor in the conduct of the sponsor's program. This agreement must outline the obligations and full relationship between the sponsor and third party on all matters involving the administration of their exchange visitor program. A sponsor's use of a third party does not relieve the sponsor of its obligations to comply with and to ensure third party compliance with Exchange Visitor Program regulations. Any failure by any third party to comply with the regulations set forth in this Part or with any additional terms and conditions governing Exchange

A9

Visitor Program administration that the Department may from time to time impose will be imputed to the sponsors engaging such third party.

**(2)** *Screening and vetting third parties operating outside the United States.* Sponsors must ascertain that third parties operating outside the United States are legitimate entities within the context of their home country environment. For third parties that operate as businesses, sponsors must obtain relevant home country documentation, such as a business registration or certification. Such home country documentation must include an English Language translation for any business registration or certification documents submitted in a foreign language. Written agreements between sponsors and third parties operating outside the United States must include annually updated price lists for training and internship programs offered by each third party, and must indicate that such overseas third parties are sufficiently trained in all aspects of the programs they represent, including the regulations set forth in this Part.

**(3)** *Screening and vetting host organizations.* Sponsors must adequately screen all potential host organizations at which a trainee or intern will be placed by obtaining the following information:

> **(i)** Employer Identification Number (EIN) used for tax purposes;

> **(ii)** Third party verification of telephone number, address, and professional activities, e.g., via advertising, brochures, Web site, and/or feedback from prior participants; and

> **(iii)** Verification of Worker's Compensation Insurance Policy or equivalent in each state or, if applicable, evidence of state exemption from requirement of coverage.

**(4)** *Site visits of host organizations.* Sponsors must conduct site visits of host organizations that have not previously participated successfully in the sponsor's training and internship programs and that have fewer than 25 employees or less than three million dollars in annual revenue. Placements at academic institutions or at federal, state, or local government offices are specifically excluded from this requirement. The purpose of the site visits is for the sponsors to ensure that host organizations possess and maintain the ability and resources to provide structured and guided work-based learning experiences according to individualized T/IPPs and that host organizations understand and meet their obligations set forth in this Part.

**22 C.F.R. § 62.50, Sanctions**

**(a)** *Reasons for sanctions.* The Department of State (Department) may impose sanctions against a sponsor upon a finding by its Office of Exchange Coordination and Designation (Office) that the sponsor has:

> **(1)** Violated one or more provisions of this Part;

> **(2)** Evidenced a pattern of failure to comply with one or more provisions of this Part;

> **(3)** Committed an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor; or

> **(4)** Otherwise conducted its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute.

**(b)** *Lesser sanctions.*

> **(1)** In order to ensure full compliance with the regulations in this Part, the Department, in its discretion and depending on the nature and seriousness of the violation, may impose any or all of the following sanctions ("lesser sanctions") on a sponsor upon a finding that the sponsor engaged in any of the acts or omissions set forth in paragraph (a) of this section:

>> **(i)** A written reprimand to the sponsor, with a warning that repeated or persistent violations of the regulations in this part may result in suspension or revocation of the sponsor's Exchange Visitor Program designation, or other sanctions as set forth herein;

>> **(ii)** A declaration placing the exchange visitor sponsor's program on probation, for a period of time determined by the Department in its discretion, signifying a pattern of violation of regulations such that further violations could lead to suspension or revocation of the sponsor's Exchange Visitor Program designation, or other sanctions as set forth herein;

>> **(iii)** A corrective action plan designed to cure the sponsor's violations; or

>> **(iv)** Up to a 15 percent (15%) reduction in the authorized number of exchange visitors in the sponsor's program or in the geographic area of its recruitment or activity. If the sponsor continues to violate the

A11

regulations in this Part, the Department may impose subsequent additional reductions, in ten-percent (10%) increments, in the authorized number of exchange visitors in the sponsor's program or in the geographic area of its recruitment or activity.

**(2)** Within ten (10) days after service of the written notice to the sponsor imposing any of the sanctions set forth in paragraph (b)(1) of this section, the sponsor may submit to the Office a statement in opposition to or mitigation of the sanction. Such statement may not exceed 20 pages in length, double-spaced and, if appropriate, may include additional documentary material. Sponsors shall include with all documentary material an index of the documents and a summary of the relevance of each document presented. Upon review and consideration of such submission, the Office may, in its discretion, modify, withdraw, or confirm such sanction. All materials the sponsor submits will become a part of the sponsor's file with the Office.

**(3)** The decision of the Office is the final Department decision with regard to lesser sanctions in paragraphs (b)(1)(i) through (iv) of this section.

**(c)** *Suspension.*

**(1)** Upon a finding that a sponsor has committed a serious act of omission or commission which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor, or of damaging the national security interests of the United States, the Office may serve the sponsor with written notice of its decision to suspend the designation of the sponsor's program for a period not to exceed one hundred twenty (120) days. Such notice must specify the grounds for the sanction and the effective date thereof, advise the sponsor of its right to oppose the suspension, and identify the procedures for submitting a statement of opposition thereto. Suspension under this paragraph need not be preceded by the imposition of any other sanction or notice.

**(2)**

**(i)** Within five (5) days after service of such notice, the sponsor may submit to the Principal Deputy Assistant Secretary for Educational and Cultural Affairs (Principal Deputy Assistant Secretary, or PDAS) a statement in opposition to the Office's decision. Such statement may not exceed 20 pages in length, double-spaced and, if appropriate, may include additional documentary material. A sponsor shall include with all documentary material an index of the documents and a summary of the relevance of each document presented. The submission of a

A12

statement in opposition to the Office's decision will not serve to stay the effective date of the suspension.

**(ii)** Within five (5) days after receipt of, and upon consideration of, such opposition, the Principal Deputy Assistant Secretary shall confirm, modify, or withdraw the suspension by serving the sponsor with a written decision. Such decision must specify the grounds therefore, and advise the sponsor of the procedures for requesting review of the decision.

**(iii)** All materials the sponsor submits will become a part of the sponsor's file with the Office.

**(3)** The procedures for review of the decision of the Principal Deputy Assistant Secretary are set forth in paragraphs (d)(3) and (4), (g), and (h) of this section, except that the submission of a request for review will not serve to stay the suspension.

**(d)** *Revocation of designation.*

**(1)** Upon a finding of any act or omission set forth at paragraph (a) of this section, the Office may serve a sponsor with not less than thirty (30) days' written notice of its intent to revoke the sponsor's Exchange Visitor Program designation. Such notice must specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto. Revocation of designation under this paragraph need not be preceded by the imposition of any other sanction or notice.

**(2)**

**(i)** Within ten (10) days after service of such written notice of intent to revoke designation, the sponsor may submit to the Principal Deputy Assistant Secretary a statement in opposition to or mitigation of the proposed sanction, which may include a request for a meeting.

**(ii)** The submission of such statement will serve to stay the effective date of the proposed sanction pending the decision of the Principal Deputy Assistant Secretary.

**(iii)** The Principal Deputy Assistant Secretary shall provide a copy of the statement in opposition to or mitigation of the proposed sanction to the Office. The Office shall submit a statement in response, and shall provide the sponsor with a copy thereof.

A13

**(iv)** A statement in opposition to or mitigation of the proposed sanction, or statement in response thereto, may not exceed 25 pages in length, double-spaced and, if appropriate, may include additional documentary material. Any additional documentary material may include an index of the documents and a summary of the relevance of each document presented.

**(v)** Upon consideration of such statements, the Principal Deputy Assistant Secretary shall modify, withdraw, or confirm the proposed sanction by serving the sponsor with a written decision. Such decision shall specify the grounds therefor, identify its effective date, advise the sponsor of its right to request a review, and identify the procedures for requesting such review.

**(vi)** All materials the sponsor submits will become a part of the sponsor's file with the Office.

**(3)** Within ten (10) days after service of such written notice of the decision of the Principal Deputy Assistant Secretary, the sponsor may submit a request for review with the Principal Deputy Assistant Secretary. The submission of such request for review will serve to stay the effective date of the decision pending the outcome of the review.

**(4)** Within ten (10) days after receipt of such request for review, the Department shall designate a panel of three Review Officers pursuant to paragraph (g) of this section, and the Principal Deputy Assistant Secretary shall forward to each panel member all notices, statements, and decisions submitted or provided pursuant to the preceding paragraphs of paragraph (d) of this section. Thereafter, the review will be conducted pursuant to paragraphs (g) and (h) of this section.

**(e)** *Denial of application for redesignation.* Upon a finding of any act or omission set forth at paragraph (a) of this section, the Office may serve a sponsor with not less than thirty (30) days' written notice of its intent to deny the sponsor's application for redesignation. Such notice must specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto. Denial of redesignation under this section need not be preceded by the imposition of any other sanction or notice. The procedures for opposing a proposed denial of redesignation are set forth in paragraphs (d)(2), (d)(3), (d)(4), (g), and (h) of this section.

**(f)** *Responsible officers.* The Office may direct a sponsor to suspend or revoke the appointment of a responsible officer or alternate responsible officer for any of the

A14

reasons set forth in paragraph (a) of this section. The procedures for suspending or revoking a responsible officer or alternate responsible officer are set forth at paragraphs (d), (g), and (h) of this section.

**(g)** *Review officers.* A panel of three Review Officers shall hear a sponsor's request for review pursuant to paragraphs (c), (d), (e), and (f) of this section. The Under Secretary of State for Public Diplomacy and Public Affairs shall designate one senior official from an office reporting to him/her, other than from the Bureau of Educational and Cultural Affairs, as a member of the Panel. The Assistant Secretary of State for Consular Affairs and the Legal Adviser shall each designate one senior official from their bureaus as members of the Panel.

**(h)** *Review.* The Review Officers may affirm, modify, or reverse the sanction imposed by the Principal Deputy Assistant Secretary. The following procedures shall apply to the review:

**(1)** Upon its designation, the panel of Review Officers shall promptly notify the Principal Deputy Assistant Secretary and the sponsor in writing of the identity of the Review Officers and the address to which all communications with the Review Officers shall be directed.

**(2)** Within fifteen (15) days after service of such notice, the sponsor may submit to the Review Officers four (4) copies of a statement identifying the grounds on which the sponsor asserts that the decision of the Principal Deputy Assistant Secretary should be reversed or modified. Any such statement may not exceed 25 pages in length, double-spaced; and any attachments thereto shall not exceed 50 pages. A sponsor shall include with all attachments an index of the documents and a summary of the relevance of each document presented. The Review Officers shall transmit one (1) copy of any such statement to the Principal Deputy Assistant Secretary, who shall, within fifteen (15) days after receipt of such statement, submit four (4) copies of a statement in response. Any such statement may not exceed 25 pages in length, double-spaced; and any attachments thereto shall not exceed 50 pages. The Principal Deputy Assistant Secretary shall include with all attachments an index of the documents and a summary of the relevance of each document presented. The Review Officers shall transmit one (1) copy of any such statement to the sponsor. No other submissions may be made unless specifically authorized by the Review Officers.

**(3)** If the Review Officers determine, in their sole discretion, that a meeting for the purpose of clarification of the written submissions should be held, they shall schedule a meeting to be held within twenty (20) days after the receipt of the last written submission. The meeting will be limited to no

A15

more than two (2) hours. The purpose of the meeting will be limited to the clarification of the written submissions. No transcript may be taken and no evidence, either through documents or by witnesses, will be received. The sponsor and the representative of the Principal Deputy Assistant Secretary may attend the meeting on their own behalf and may be accompanied by counsel.

**(4)** Following the conclusion of the meeting, or the submission of the last written submission if no meeting is held, the Review Officers shall promptly review the submissions of the sponsor and the Principal Deputy Assistant Secretary, and shall issue a signed written decision within thirty (30) days, stating the basis for their decision. A copy of the decision will be delivered to the Principal Deputy Assistant Secretary and the sponsor.

**(5)** If the Review Officers decide to affirm or modify the sanction, a copy of their decision shall also be delivered to the Department of Homeland Security and to the Bureau of Consular Affairs of the Department of State. The Office, at its discretion, may further distribute the decision.

**(6)** Unless otherwise indicated, the sanction, if affirmed or modified, is effective as of the date of the Review Officers' written decision, except in the case of suspension of program designation, which is effective as of the date specified pursuant to paragraph (c) of this section.

**(i)** *Effect of suspension, revocation, or denial of redesignation.* A sponsor against which an order of suspension, revocation, or denial of redesignation has become effective may not thereafter issue any Certificate of Eligibility for Exchange Visitor (J-1) Status (Form DS-2019) or advertise, recruit for, or otherwise promote its program. Under no circumstances shall the sponsor facilitate the entry of an exchange visitor into the United States. An order of suspension, revocation, or denial of redesignation will not in any way diminish or restrict the sponsor's legal or financial responsibilities to existing program applicants or participants.

**(j)** *Miscellaneous—*

**(1)** *Computation of time.* In computing any period of time prescribed or allowed by these regulations, the day of the act or event from which the designated period of time begins to run is not included. The last day of the period so computed is included unless it is a Saturday, a Sunday, or a Federal legal holiday, in which event the period runs until the end of the next day which is not one of the aforementioned days. When the period of time prescribed or allowed is fewer than eleven (11) days, intermediate Saturdays, Sundays, or Federal legal holidays are excluded in the computation.

A16

**(2)** *Service of notice to sponsor.* Service of notice to a sponsor pursuant to this section may be accomplished through written notice by mail, delivery, or facsimile, upon the president, chief executive officer, managing director, General Counsel, responsible officer, or alternate responsible officer of the sponsor.

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Stephen Moore
Senior Appellate Paralegal
COUNSEL PRESS LLC